[Crim. No. 1913.   In Bank.—February 3, 1916.]

## In the Matter of the Application of WILLIAM J. DART, for a Writ of Habeas Corpus.

MUNICIPAL CORPORATION—ORDINANCE PROHIBITING SOLICITATION FOR CHARITY—CONSTITUTIONAL LAW.—A municipal ordinance, to the extent that it gives a commission established by the municipality the absolute and arbitrary power to forbid any person from soliciting for private charity, regardless of his personal character, worth, or fitness, or from selling goods donated to such charity, is unconstitutional and void.

APPLICATION for a Writ of Habeas Corpus directed to the Chief of Police and one of the Police Judges of the City of Los Angeles.

The facts are stated in the opinion of the court.

Gibson, Dunn & Crutcher, Edward E. Bacon, and William A. Barnhill, for Petitioner.

Warren L. Williams, City Prosecutor, Samuel Barnes Smith, Deputy City Prosecutor, and Andrew J. Copp, Jr., for Respondents.

HENSHAW, J.—The authorities of the city of Los Angeles adopted two ordinances. By one was created a Municipal Charities Commission, whose powers and duties were defined. Amongst those powers and duties are:

" (1). To investigate all charities dependent upon public appeal or general solicitation for support and to indorse such of them as meet actual needs of the community, attain a rea-

sonable standard of efficiency and are so conducted as to insure the public of the wise use of the funds.''

The second of these ordinances prohibits begging in the public streets or places in the city, and regulates the soliciting of alms and contributions for charitable purposes. It provides as follows:

'' Sec. 2. It shall be unlawful for any person, firm, corporation or association to solicit alms, food, clothing, money or contributions within the City of Los Angeles, without first securing a permit so to do from the Municipal Charities Commission of said city. Provided, however, that the provisions of this section shall not apply to properly accredited solicitors of established churches of said city soliciting for purely religious purposes, but it shall apply to the various institutional works carried on by said churches in like manner as other persons, firms, corporations and associations. The permit from the Charities Commission above referred to shall consist of a written certificate issued by the said commission certifying that the object of said solicitation is worthy and meritorious and authorizing the soliciting of gifts and donations therefor; said permits may be revoked by said Commission at any time.

''Sec. 3. It shall be unlawful for any person to solicit or collect for any charitable or philanthropic organization, without first obtaining a written permit so to do from the Municipal Charities Commission; said permit shall be revocable at any time in the discretion of said Commission, which may adopt such regulations regarding the soliciting and collecting of funds as its judgment may dictate, and it shall be obligatory upon the holders of such permits to abide by such rules and regulations.

''Sec. 4. It shall be unlawful for any person, firm, corporation or association to give or promote any entertainment, fair, bazaar or benefit in the name of charity or philanthropy, without first obtaining a written permit so to do, from the Municipal Charities Commission, said permit to be revocable at any time at the discretion of said Commission.

''Sec. 5. It shall be unlawful for any person, firm, corporation or association to solicit funds within the City of Los Angeles for any ethical, evangelistic, religious, missionary or charitable purposes without having first obtained an indorsement certificate from the Municipal Charities Commission.

Provided, however, that the provisions of this section shall not apply to established and recognized churches or other religious organizations in the City of Los Angeles.

"Sec. 6.    It shall be unlawful for any person, firm, corporation or association to sell, or offer for sale, any clothing, household goods, or other goods, wares or merchandise which have been solicited or donated for charity or philanthropy without first obtaining a written permit so to do from the Municipal Charities Commission, said permit to be revocable at any time at the discretion of said Commission."

Petitioner was arrested under two criminal complaints charging violations of these ordinances.    By the first of these complaints he was accused of soliciting "alms, food, clothing, money and contributions . . . without first securing or having a permit or written certificate so to do from the Municipal Charities Commission."    By the second of these complaints, his crime was in "selling and offering for sale clothing, household goods and other goods, wares, and merchandise which had been solicited and donated for charity and philanthropy, without first obtaining or having a written permit so to do from the Municipal Charities Commission."

The following facts appear without controversy: The Salvation Army is a religious organization founded on and believing in the teachings of Christ.    It has been established for fifty years.    It has its churches and charitable organizations throughout the United States and other countries.    Profoundly impressed with the Founder's sympathy for the poor and afflicted, and with His teachings that "Now abideth faith, hope and charity, these three, but the greatest of these is charity," and, "Now, the end of the commandment is charity out of a pure heart," it has made its special field of religious work the relief of the destitute and the rescue of society's outcasts. It has found that it cannot lead the spirit of the weary and heavy burdened without first ministering to his physical necessities.    While "man does not live by bread only," he cannot live at all without bread.    Therefore, the charitable organizations of the Salvation Army are vital, integral parts of its religious life and work.

For twenty-five years it has prosecuted its religious and charitable work in the city of Los Angeles.    It there maintains an "Industrial Home" where men out of employment are given food and lodging without charge, but are required, for

their own self-respect, and to the end that mere professional beggary be not fostered, to perform such labor as is within their power, being paid the value thereof. It maintains a "Rescue Home and Maternity Hospital" in which, without charge, food, lodgings, and hospital service are afforded needy married women and unfortunate girls. It maintains a "Young Woman's Boarding House," giving for an extremely low price to homeless girls and women clean, wholesome food and lodging, and helpful moral influences. It maintains four other hotels and lodging-houses where the destitute are housed and homed free of charge, and where but a small charge is exacted from those able to pay. An average of twenty-seven persons per night are given shelter in these hotels free of all charge. It also maintains nine stores where second-hand clothing, furniture, rags, paper, and junk of various kinds, contributed by the charitable, are sold at low prices. In these stores, and in the renovatory work necessary to make many contributed articles salable, employment is given to the needy, who thus become self-sustaining and self-respecting. In the years of its labors the Salvation Army has acquired properties of much value in Los Angeles, all of which are used for one or another of the described purposes. It has alleviated suffering, and given relief and employment in thousands of cases. Its books of financial account are and always have been open to the inspection and examination of its contributors, and no one of those contributors has ever voiced any complaint touching the honesty and efficiency of the Army's administrative work.

After its creation the Charities Commission, claiming the power so to do under the aforesaid ordinances, on or about the sixth day of October, 1913, demanded in writing, of the Salvation Army, that it should, as a condition precedent to obtaining the indorsement or permit of the commission for carrying on or soliciting contributions for any of its above-described charitable work in said city, be governed by a local board of managers, or trustees, all of whom should be residents of the city of Los Angeles, and representative Los Angeles citizens, and that all the property of the Salvation Army in the city should be conveyed to and held by such local board, and that the financial work of the Salvation Army in the city should be conducted by such local board; that no budgets for funds should be prepared and enforced on the Los Angeles

workers for any purpose other than Los Angeles work; and that no funds should be sent out of Los Angeles for the use of the Salvation Army elsewhere, except by the direction of such local board, or of the Municipal Charities Commission; and that Christmas offerings, self-denial, harvest festival, and like accustomed contributions of the Salvation Army should not be used except for local purposes, and that all proceeds derived by the Salvation Army from the conduct of its aforesaid institutions in Los Angeles (whether self-sustaining or not), should be used exclusively for the extension of its work in the city, and not be subject to assessment by territorial (i. e., national) officers of the Salvation Army. Next the Charities Commission exacted that title to all property of the Salvation Army in Los Angeles should be vested in a corporation, and this was done. Thereafter the Salvation Army and its corporation petitioned the Charities Commission for a permit allowing it to continue its charities and its petition was denied. Always desirous of yielding obedience to the law, and of "rendering to Caesar the things that are Caesar's," the Salvation Army endeavored to comply with the exactions of the Charities Commission, but was unable to comply with some of them without impairing its efficiency and integrity as an organized society for religio-charitable work. Failing to secure the permit, the Salvation Army continued this work. The petitioner is one of its officers. In the performance of his duties as such officer, and not otherwise, he has been subjected to these arrests and charged with these crimes.

In setting forth the foregoing facts we are not unmindful of the limitations put on our inquiry under this writ. The validity of these ordinances is to be determined from their provisions, and the question of their validity or invalidity is all that concerns us here. Nevertheless, and assuming for the moment the validity of the ordinances, these facts are highly instructive as illustrating the extent of the power conferred and the manner of its exercise. Here is a great and living charity doing good to thousands of the needy and heavy-laden of Los Angeles, struck dead because it does not make over the management of its affairs to a local board of "representative citizens," and cannot agree that it will dispense the bounty which it receives exclusively for local purposes. Charity is not only to begin at home, but to end at home, saving,

as under "permit," it may be suffered to go abroad. The quality of Mercy (and so necessarily of Charity) we are told

—"is not strained;
It droppeth as the gentle rain from Heaven
Upon the place beneath."

But in Los Angeles it is to be strained, and drop as from a sprinkling-pot in the guiding hand of the Charity Commission. But this exemplification of the use of the power is not, of course, an argument against the existence of the power itself. Conceding the existence of the power, if in any instance an illegal exercise of it has been made, that fact will constitute a defense to a prosecution, but will not be effective to destroy the validity of the grant of power itself. The basic question still remains: May a private charitable association, order, or organization be denied the right to fulfill the purposes of its existence saving under a "permit" from the authorities? We here use the term "private charity" as meaning one not supported in whole or in part by state or municipal funds. Over the latter class manifestly the power of regulation and control is great if not plenary.

Certain features of these ordinances at once strike the reader. Money may be freely sent abroad by any "established church" for the uplift of the soul of the Senegambian, and this is very well; but no penny can be sent to Belgium, to Poland, to Serbia, to still the wailing of the children, or allay the anguish of the women, except under a "permit" from the Charity Commission. Nay, more, in the city of Los Angeles itself, its needy childhood goes unfed and unclothed, its dependent womanhood unprotected and uncared for by organized charities except they have a "permit." Surely here if anywhere is

"The organized charity, scrimped and iced
In the name of a cautious statistical Christ."

Respondent argues that charitable institutions soliciting contributions from the general public thus secure public trust funds, and that it is quite within governmental powers for the state or its municipal agencies to regulate the collection and disposition of such trust funds. It is freely conceded, indeed, it is proclaimed, that reasonable regulations may be adopted touching and to a limited extent controlling the operation of charitable institutions dependent in whole or in

part on public beneficence. But respondent fails to perceive or at least to discuss the distinction, as broad as the temperate zone, between a law imposing reasonable regulations to effectuate these ends on *all* such charitable institutions, and a law which makes the right to solicit at all, and thus the right of a given charity to exist dependent on the arbitrary will of a Charity Commission. Again, let us illustrate. Respondent in its brief thus defines the power of the Charity Commission: "The Municipal Charities Commission is delegated power to indorse [which means grant permits to charitable institutions under which alone they are entitled to live] such charitable institutions as meet the actual needs of the community, attain a reasonable standard of efficiency, and are so conducted as to insure the public in the wise use of funds." This language taken from the first of the ordinances above quoted, *sounds* reasonable. But as interpreted by the Municipal Charities Commission, What does it mean? In their own language it is this: Such a charity is "one that will execute every trust for charity with the least possible delay, with the greatest possible efficiency and with the least possible deduction for expense." Here is a mark set, and that mark is the absolute perfection of human endeavor. No tolerance, no charity, is shown by this Commission of Charities, for any human effort, however self-sacrificing and efficient, that does not attain human perfection. Charities in Los Angeles must reach a pitch of perfection unattained by any other human institution, or in the view of the Municipal Charities Commission they are unfit to live.

But let us eliminate from consideration these constructions put by the Municipal Charities Commission on their own powers, which are but delegated powers, and meet the question of the existence of this power at its source. Can the municipal authorities of a city arbitrarily say what person or what institution may or may not engage in charitable work dependent wholly or in part upon voluntary contributions from the public? Unhesitatingly we answer that this cannot be done, that it constitutes an attempt to use the police power in an arbitrary, unreasonable, and oppressive manner. It necessarily contains an assertion of the power to prohibit and suppress vocations and occupations which, entirely aside from their religious character, are from a worldly point of view in and of themselves not only harmless but positively beneficial to

humanity. The power to pass reasonable regulations in such a case bears no relationship to the power to prohibit or suppress. (*Yick Wo.* v. *Hopkins,* 118 U. S. 356, [30 L. Ed. 220, 6 Sup. Ct. Rep. 1064]; *Los Angeles* v. *Hollywood Cemetery Assn.,* 124 Cal. 344, [71 Am. St. Rep. 75, 57 Pac. 153]; *In re Johnston,* 137 Cal. 115, [69 Pac. 972]; *Sonora* v. *Curtin,* 137 Cal. 583, [70 Pac. 674].).

Such charitable work is not to be confounded with beggary which imports personal gain. Most often those who devote themselves to such charities live lives of self-denial and self-abnegation for the sake of others. And the utmost limit of reasonable regulation in the matter is reached by acts protecting the public from charlatans and imposters, insuring knowledge on the part of the donors of the purposes to which their contributions may be put, coupled with adequate safeguards against malversation as to the funds received. But this falls far short of the law here under review, which permits such charitable work to be carried on only by (again to quote respondent) "trustees satisfactory to the Municipal Charities Commission."

But in further support of the argument that the Charities Commission, or the Municipal Council, may thus forbid a man from devoting his life to this form of self-denial and good works, it is said that neither the constitution of the United States, nor the constitution of this state, guarantees him the right so to do as they guarantee him the free exercise of his religion. They do not. Neither do they guarantee to a man the right to love, to show mercy, to forgive his enemies, or to walk in the path of rectitude. The existence of some human rights is taken for granted in both of these august instruments. We have heard one Chief Executive of this nation declare that he construed the constitution as conferring on his department all powers not expressly withheld. The construction has not as yet met with favor from the jurisconsults. As little accord can be given to a construction which denies to the individual any right not expressly reserved and preserved to him. But if driven to authority to support this declaration, we can at least point out that the Declaration of Independence recognizes the right of all mankind to pursue happiness. When that pursuit takes the innocent and admirable form of effort to better the lot of the poor and oppressed, whether happiness be found solely in the consciousness of the doing of kindly

deeds, or whether it be found in the conviction that one is thereby following the precepts of a Divine Teacher, in either case it lies not within the ordained powers of our government, national, state, or municipal, to say that such a vocation shall not be followed, such a life shall not be led.

So far we have dealt with the question in what, for lack of a better word, we may term its secular aspect only. From this point of view our remarks and conclusions apply equally to all charities, whether temporal or religious.

But there is another aspect of the question clearly presented, and as clearly demanding consideration. This is the religious aspect. The petition shows that the charities of the Salvation Army are a vital part of its religious life work. One need not write as a theologian in expressing, as we do, the most profound veneration for religion as embodying the highest ethical concepts of a people, and as satisfying their spiritual yearning for a life finer than this earthly one. The two religions exercising the most potent influence in shaping the material and spiritual destinies of the white-skinned races are the Jewish and the Christian. To these as to all others perfect freedom of exercise is constitutionally guaranteed. In both of these religions charity is the central word. It is enjoined, not as a good thing, or a wise thing, or as a kindly thing only, but as a fundamental part of the religion itself. Says the Jewish faith: "On three things the world is stayed; on the Thorah (the law) and on worship and on the bestowal of kindness." "Now the end of the commandment is charity out of a pure heart," says Paul to Timothy. "Charity is the scope of all God's commands," preaches Chrysostom. "All perfection of the Christian life is to be attained according to charity," declares Thomas Aquinas. Does it need more, does it need so much, to show that in these religions the bestowal of charity, the devotion of life to charity, are a part of the religion itself? And does it demand discussion to establish so plain a truth as that touching religion there is a doubtful zone which legislation should be most reluctant to enter? The founders of the nation recognized it when they placed the great guaranty of religious liberty in the constitution of a free people, and it is for every court to see that that liberty is not encroached upon and that freedom gnawed and impaired by any experimental legislation however well meant So when legislation does enter that uncertain domain, the fact

that it is there must bring to it condemnation. In accordance with the dictate of the constitution itself the doubt will be resolved in favor of religious liberty. And it will be found better in the long run that the free exercise of religion be preserved in its integrity, better for the nation, better for charity itself which owes so much to religion, even if the efficiency of religious charities be not up to the standard of perfection set by the Municipal Charities Commission. If, under that standard, seventy-five cents of every dollar would go to the objects of charity, while under the less efficient methods in vogue but fifty cents of each dollar actually reaches the beneficiaries, it is not to be forgotten that there will be many millions fewer of these dollars to be distributed in charity if the activities of the religious are hampered, thwarted, and stayed.

Wherefore the prisoner is discharged from custody.

Melvin, J., and Lorigan, J., concurred.

SHAW, J., Concurring.—The occupation of soliciting contributions to charitable purposes is clearly so far subject to the police power, that it may be regulated by laws or ordinances providing for a reasonable supervision over the persons engaged therein, and for the application and use of the contributions received to the purposes intended, in order to prevent unscrupulous persons from obtaining money, or other things, under the pretense that they were to be applied to charity, and to prevent the wrongful diversion of such funds to other uses, or to secure them against waste. Measures reasonably tending to secure these ends are unquestionably valid.

If the ordinances in question here were reasonably appropriate for the attainment of these objects, there could be no valid objection to them based on the ground that they deprived persons of liberty, or unduly restricted them in the pursuit of happiness. But they do not merely empower the Municipal Charities Commission to inquire or examine into the character of persons soliciting for charity and withhold permits from all who do not come within fixed standards of character and fitness. They give the commission absolute and arbitrary power to forbid any person from soliciting for charity, regardless of his personal character, worth, or fitness. No standard of character or fitness is set by which the commission is to be

guided in giving or withholding permits. The only thing required is that the commission shall find that the "object of said solicitation is worthy and meritorious." Persons of the highest character, desiring to solicit for a worthy cause, might be refused a permit for no reason except the arbitrary will of the commission. Every person has the right, under our constitution, and perhaps without its guarantee, to solicit contributions for a worthy charitable purpose, provided he acts in good faith and honestly applies them to that purpose. The ordinances give the commission power to deprive persons of that right without cause or reason. To the extent that they give this arbitrary power they are contrary to the constitution and void. They come within the principles stated by the supreme court of the United States in *Yick Wo* v. *Hopkins,* 118 U. S. 356, [30 L. Ed. 220, 6 Sup. Ct. Rep. 1064], and by this court in *Ex parte Sing Lee,* 96 Cal. 359, [31 Am. St. Rep. 218, 24 L. R. A. 195, 31 Pac. 245], *County of Los Angeles* v. *Hollywood Cemetery Assn.,* 124 Cal. 349, 71 Am. St. Rep. 75, 57 Pac. 153]; *Schaezlein* v. *Cabaniss,* 135 Cal. 469, [87 Am. St. Rep. 122, 56 L. R. A. 733, 67 Pac. 755], and *Hewitt* v. *State Board of Medical Examiners,* 148 Cal. 593, [113 Am. St. Rep. 315, 7 Ann. Cas. 750, 3 L. R. A. (N. S.) 896, 84 Pac. 39].

In the Yick Wo case, referring to ordinances prohibiting laundries in wooden buildings except by permission from the board of supervisors, the court said: "They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. So that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of *mandamus,* to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their consent, without reason and without responsibility. (118 U. S. 366, [30 L. Ed. 220, 6 Sup. Ct. Rep. 1069].) . . . It does not prescribe a rule and conditions for the regulation of the use

of property for laundry purposes, to which all similarly situated may conform" (118 U. S. 368, [30 L. Ed. 220, 6 Sup. Ct. Rep. 1069]). And in *County of Los Angeles* v. *Hollywood Cemetery Assn., supra,* the court said: "There is a wide difference between regulation and prohibition—between regulatory provisions as a condition imposed for the exercise of a lawful occupation, and making the right itself to depend upon the unrestrained will of the municipality. . . . If the business be lawful, and having no injurious tendency, they cannot say who shall and who shall not exercise the right itself. Under the guise of regulating a business the municipality cannot make prohibition possible by committing to the officers of the municipality the arbitrary power to deny permission to engage in that business." The proper method of regulating a lawful business is indicated in *Hewitt* v. *State Board of Medical Examiners, supra,* as follows: "The right of the physician to be secure in his privilege of practicing his profession is thus made to depend not upon any definition which the law furnishes him as to what shall constitute 'grossly improbable statements' but upon the determination of the board after the statement is made and simply upon its opinion of its improbability. No definite standard is furnished by the law under this provision whereby a physician with any safety can advertise his medical business; nor is there any definite rule declared whereby after such advertisement is had the board of medical examiners shall be controlled in determining its probability or improbability. The physician is not advised what statements he may make which will not be deemed 'grossly improbable' by the board. No rule is provided whereby he can tell whether the publication he makes will bring him within the ban of the provision or not. . . . (148 Cal. 595, [113 Am. St. Rep. 315, 7 Ann. Cas. 750, 3 L. R. A. (N. S.) 896, 84 Pac. 41].) If a physician's license is to be revoked for 'grossly improbable statements'; if he is to be thereby deprived of his means of livelihood, of his right to practice a profession which it has taken him years of study and a large expenditure of money to qualify himself for, on the ground that he has made 'grossly improbable statements' in advertising his medical business— it is requisite that the statute authorizing such revocation define what shall constitute such statements so that the physician may know in advance the penalty he incurs in making them." Other methods of regulation may also be allowable; but a law

or ordinance by or under which a lawful occupation, in itself, when properly conducted, in nowise injurious to persons, property or the public interest, may be absolutely prohibited at the dictation of any official body without other cause than its own will or desire, is beyond the legislative power and to that extent void.

There is a class of cases upon which the respondent relies as contravening the above-stated principles, such, for example, as *Ex parte Fiske*, 72 Cal. 127, [13 Pac. 310] ; *In re Flaherty*, 105 Cal. 558, [27 L. R. A. 529, 38 Pac. 981], and *Barbier* v. *Connelly*, 113 U. S. 27, [28 L. Ed. 923, 5 Sup. Ct. Rep. 357]. It will be found, however, that these cases relate to things which in their nature are or may be injurious to public health, safety, comfort or welfare, and that they do not infringe upon the principles above stated with regard to the regulation of occupations which are both lawful and innocuous. In the Flaherty case the distinction is stated. After holding that an ordinance forbidding the beating of drums upon the streets without a permit from the president of the board of trustees was valid, the court, referring to other cases which seemed to conflict with the decision, and which are similar to the case at bar, said: "But upon closer examination they will be found to go upon a distinction or principle, whether sound or not, that is not applicable to the case at bar. They are based upon the theory that the lawful inherent rights of men cannot be entirely suppressed or destroyed by statute or ordinance, but can only be *regulated,* and that all regulations of such rights must be uniform" (105 Cal. 565, [27 L. R. A. 529, 38 Pac. 983]), and again, "At all events, the cases referred to deal with a right. But the proposition that a man has a natural, ingrained, inviolate, common law or constitutional right to beat a drum on the traveled streets of a city has no foundation in reason or authority. As, therefore, it is not a right that may not be entirely suppressed, it may be regulated as the law making power may determine," and that "as it could be suppressed, no one could be heard to complain of an ordinance regulating it because thereby special privileges accrued to particular persons" (105 Cal. 566, [27 L. R. A. 529, 38 Pac. 983]). The distinction between cases like *Ex parte Fiske*, 72 Cal. 127, [13 Pac. 310], and the present case, is that in this case the right which the commission has power absolutely to take away is a lawful and innocent occupation which the legis-

lature cannot entirely suppress, and as to which its functions are merely to regulate its conduct and prevent abuses. There are other cases relating to ordinances which, after prohibiting certain things, delegate to some officer or board the power to decide whether or not a given person or subject comes within the terms of the prohibition. These are not in conflict with the principles above stated, nor are they applicable to this case. For these reasons I am of the opinion that the portion of the ordinance in question imposing a penalty upon anyone who solicits contributions for charitable purposes without a permit from the commission, is void. The section of the ordinance prohibiting the sale of any goods donated to charity without first obtaining a similar permit is invalid for like reasons.

I concur in the judgment discharging the prisoner.

Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.