STATE v. MRS. J. F. HUNDLEY AND MISS LOUISA HOFFMAN.

(Filed 28 March, 1928.)

**Municipal Corporations—Ordinances—Validity.**

> A city ordinance passed in pursuance of C. S., 2787(11), requiring a license to be issued by the municipal authorities to beg upon the city streets or to solicit contributions for charitable or religious purposes, in accordance with whether the person or purpose is ascertained by such authorities as worthy or whether the moneys solicited will be properly applied, is a valid and undiscriminating exercise of a police power, and not unlawful as an interference with the religious liberties of our people, or an obstruction to the lawful pursuit of their business.

STACY, C. J., and ADAMS, J., concurring.
CLARKSON and BROGDEN, J.J.,-dissenting.

APPEAL by defendants from *Webb, J.,* at July Term, 1927, of MECK-LENBURG. No error.

Each of the defendants was tried in the recorder's court of the city of Charlotte, upon a warrant issued on 27 June, 1927, charging a violation of an ordinance of the city of Charlotte. From judgments upon convictions at said trials, each defendant appealed to the Superior Court of Mecklenburg County. At July Term, 1927, of said court the actions were by consent consolidated for trial. There was a verdict of "guilty" as to each defendant.

From judgment upon the verdicts defendants appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*C. Henry Edwards and Fred McCall for defendants.*

CONNOR, J. The question presented for decision by this appeal involves only the validity of an ordinance of the city of Charlotte, duly adopted and ratified on 16 December, 1926. By its terms the said ordinance became effective from and after 27 December, 1926. It is as follows:

"Section 1. It shall be unlawful for any person to engage in the business of soliciting alms, or begging charity, for his or her own livelihood, or for any charitable purpose, upon the streets of the city of Charlotte, or in any public place within the corporate limits of the city of Charlotte, without first securing a permit from the governing body of the city of Charlotte to engage in such business.

"Section 2. Any person desiring to engage in the business of begging, or soliciting alms, shall file with the governing body of the city of Charlotte an application for a permit, which permit shall state the name of the person who makes the application, the purpose for which alms or charity are to be solicited, and the manner in which said funds are to be disbursed, and the governing body of the city of Charlotte shall not issue a permit, as provided herein, to any person unless the said governing body shall be satisfied that the said applicant is a person worthy of assistance or help from the citizens of Charlotte, or that the cause said applicant represents is a worthy cause, and that the funds to be solicited will be properly disbursed.

"Section 3. That any person soliciting alms, or begging charity in violation of the provisions of this ordinance shall be guilty of a misdemeanor and liable to a fine of fifty dollars ($50), and each act done in violation hereof shall constitute a separate offense.

"Section 4. That all ordinances in conflict herewith are repealed.

"Section 5. That this ordinance shall be in full force and effect from and after the 27th day of December, 1926."

Each defendant admitted on the trial in the Superior Court that she had solicited alms on the public streets of the city of Charlotte on the days named in the affidavits upon which the warrants were issued, and that such solicitations were made by her in behalf of the American Rescue Workers, Inc., a corporation organized under the laws of the State of New York, and as such engaged in religious and charitable work in the city of Charlotte. No permit had been issued to either of the defendants or to the American Rescue Workers, Inc., by the governing body of the city of Charlotte to solicit alms on the streets of said city. Applications had been made by defendants and also by the American Rescue Workers, Inc., for such permits, pursuant to the provisions of the ordinance, but the governing body of said city had refused to issue such permits to said applicants. The defense at said trial was solely upon the ground that said ordinance is void. The defendants contended at the trial, as stated in their brief filed in this Court, "that they were guilty of no offense since, as they contend, the ordinance is unreasonable, unconstitutional and void for that it constitutes an attempt to use the police power in an arbitrary, unreasonable and oppressive manner by clothing the city commissioners with uncontrolled, unlimited, unregulated and arbitrary power to forbid and prohibit any person from soliciting for charity, regardless of his personal worth or fitness, at their ungoverned will or whimsical pleasure; and that it unwarrantedly interferes with the religious liberties of the American Rescue Workers, Inc., and obstructs them in the lawful pursuit of happiness."

At the close of the evidence, in accordance with its opinion that the ordinance is valid, the court instructed the jury that if they found from the evidence, beyond a reasonable doubt, the facts to be as contended by the State, they should return a verdict of guilty as to both defendants. Defendants excepted to this instruction and assigns same as error.

The city of Charlotte, as a municipal corporation, has the power, conferred upon it by the General Assembly, "to adopt such ordinances for the regulation and use of its streets, squares and parks and other public property belonging to the city, as it may deem best for the public welfare of the citizens of the city." C. S., 2787, subsection 11. The ordinance involved in this appeal was duly adopted by the city of Charlotte, in the exercise of the power thus conferred. It is therefore valid unless it is unreasonable and oppressive in its provisions or unless it confers upon its governing body power to discriminate arbitrarily as between persons who may apply for permit to do the things otherwise forbidden by the ordinance. An ordinance of a municipal corporation, although adopted in the exercise of power conferred by statute, may be held invalid, upon the ground that it is unreasonable. It must be impartial, fair and general. When, however, an ordinance is within the grant of power to

the municipality, the presumption is that it is reasonable. By force of this presumption, it will be held valid, unless its unreasonable and· oppressive character is apparent on its face, or unless by its terms it purports to confer power upon some public official to discriminate arbitrarily between citizens or other persons who may be affected by the provisions of the ordinance. Whether an ordinance is reasonable or unreasonable, or whether the power conferred by it may be exercised arbitrarily or not, is for the court to determine as a matter of law, from the terms of the ordinance itself. The court will not, ordinarily, inquire into the motives which prompted the adoption of the ordinance, nor, upon the trial of a criminal action for its violation, into the manner in which the ordinance has been enforced, with respect to persons other than the defendant in said action. The ordinance, when its validity is challenged upon the ground that it is unreasonable, or that it confers arbitrary power with respect to the enforcement of its provisions, must stand or fall as the same has been adopted by the municipality. As said by this Court in *S. v. Stowe,* 190 N. C., 79, "In the exercise of an unquestioned police power, much must necessarily be left to the discretion of the municipal authorities, and their acts will not be judicially interfered with, unless they are manifestly unreasonable and oppressive." The following authorities are cited in support of this principle: Dillon's Mun. Corp., sec. 379; *McLean v. Kansas,* 211 N. S., 539; *Dobbins v. Los Angeles,* 195 N. S., 223; *S. v. Kirkpatrick,* 179 N·. C., 747; *S. v. Shannonhouse,* 166 N. ·C., 241; *S. v. Lawing,* 164 N. C., 492; *S. v. Johnson,* 114 N·. C., 846.

We concur with the learned judge who presided at the trial in the Superior Court, that the ordinance is valid. We find nothing therein unreasonable or oppressive; nor does the ordinance confer upon the governing body of the city of Charlotte arbitrary power to discriminate between applicants for permits to engage in the business of soliciting alms or begging charity, for a charitable purpose, upon the streets of the city of Charlotte. It is made the duty of said governing body to issue the permit to the applicant unless said governing body shall be satisfied (1) that the said applicant is not worthy of assistance or help from the citizens of Charlotte, or (2) that the cause said applicant represents is not a worthy cause, or (3) that the funds solicited will not be properly disbursed. Evidence offered at the trial, and set out in the case on appeal shows that, with respect to the applications of defendants in this action and of the American Rescue Workers, Inc., the said governing body made extended investigations, and that the applications were refused only after long and continued consideration. It is apparent, we think, that said governing body acted in good faith and after

a careful exercise of the discretion vested in them by the ordinance in the matter of said applications.

The contention that the ordinance in question deprives the defendants and the American Rescue Workers, Inc., of their religious liberties, or that it obstructs them in the pursuit of happiness, manifestly, we think, cannot be sustained. It cannot be held as law that defendants or any other persons have a legal right to use the streets of a city for the purpose of carrying on the business of soliciting alms or begging for a charitable purpose, however, worthy, upon the ground that they are thus engaged in the exercise of their religious liberties; nor that the right of defendants to pursue their happiness is unlawfully obstructed by forbidding them to use the streets for this purpose, without a permit from the city, which gives assurance to all who may be charitably inclined that their contributions for a worthy cause will be properly disbursed. The purpose of the city of Charlotte in adopting the ordinance was, manifestly, the protection of persons who may be using its streets for the purpose for which they were constructed and are maintained, from solicitation for contributions for charitable purposes by persons who are unworthy, either because of lack of personal character, or because of lack of sufficient judgment to apply the contributions received by them wisely and properly. It would seem that the ordinance will encourage rather than discourage contributions from charitably disposed persons to worthy persons and for worthy causes. No sufficient grounds appear for holding as a matter of law that the ordinance is void. The ordinance is valid, and defendants having admitted that they had violated its provisions, as contended by the State, there is no error in the instruction of the court to the jury, which defendants assign as error. There are other assignments of error appearing in the record. They all, however, present defendants' contention that the ordinance is void. They cannot be sustained. The judgment is affirmed.

No error.

STACY, C. J., and ADAMS, J., concurring: We are of opinion that the ordinance in question is valid. It applies equally to all and to all alike. The validity of the action of the governing body in withholding permit from the present defendants is not before us for decision. The only question presented for determination is the validity of the ordinance. It vests in the governing body a sound legal discretion, which may not be exercised arbitrarily.

CLARKSON, J., dissenting: The power of the city over its streets is as follows: C. S., 2787, subsection 11: "To open new streets, change, widen, extend, and close any street that is now or may hereafter be opened, *and adopt such ordinances for the regulation and use of the*

*streets,* squares and parks, and other public property belonging to the city, as it may deem best for the public welfare of the citizens of the city."

The following ordinance adopted by the governing body of the city of Charlotte was ratified 16 December, 1926:

"Section 1. It shall be unlawful for any person to engage in the business of soliciting alms, or begging charity, for his or her own livelihood, or for any charitable purpose, upon the streets of the city of Charlotte, or in any public place within the corporate limits of the city of Charlotte, without first securing a permit from the governing body of the city of Charlotte to engage in such business.

"Section 2. Any person desiring to engage in the business of begging, or soliciting alms, shall file with the governing body of the city of Charlotte an application for a permit, which permit shall state the name of the person who makes the application, the purposes for which alms or charity are to be solicited, and the manner in which said funds are to be disbursed, *and the governing body of the city of Charlotte shall not issue a permit, as provided herein, to any person unless the said governing body shall be satisfied that the said applicant is a person worthy of assistance or help from the citizens of Charlotte, or that the cause said applicant represents is a worthy cause, and that the funds to be solicited will be properly disbursed."*

It will be noted that the power given is *"regulation and use of the streets."*

The main opinion holds that under the police power the ordinance of the governing body of the municipality is valid, and will not judicially be interfered with unless *manifestly unreasonable and oppressive.* I do not think that the main opinion deals with the vice of the ordinance. The power given to the governing body is to pass ordinances *for the regulation and use of the streets.* An ordinance passed must so regulate the use of the streets that in its application all classes of its citizens will be treated alike. For example, a parking ordinance must be applicable to all its citizens alike, uniform in its application. The certain parking zones cannot be so juggled that the governing body can grant to one a right to park in a particular locality in its discretion and refuse others. Could the governing body of the city pass an ordinance in reference to the regulation and use of the streets allowing the newsboys to sell on the streets the morning paper and not the evening paper, or *vice versa?* Is the little fellow who sells the paper less annoying than the good women soliciting alms for sweet charity's sake? The governing body declaring one worthy and the other unworthy. I say no. *City of Hammond v. Farina Bus Line and Transportation Co.,* 48 Sup. Court Reporter, 70, decided 21 November, 1927. There can be no discrimination in the

ordinance as written, it must operate equally upon all persons. "Equal rights to all, special privileges to none." The leading case—Gen., ch. 37, verses 3 and 4—When Jacob of old made Joseph "a coat of many colors" and loved him more than the other eleven of his sons "they hated him (Joseph) and could not speak peaceably unto him." The peace of the family was destroyed. Special privilege has always created hatred; therefore, to promote peace and equality, the law has always, as far as possible, laid down the broad rule of equal rights to all. No discrimina-tion, "equal protection of the laws."

Recognizing these fundamental principles, the Const. of U. S., Art. XIV, part sec. 1, is as follows: "No state shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or prop-erty, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The principle laid down by the United States Court is as follows: An objection that a state statute denies to a party the equal protection of the law can only be sustained if the statute treat the party differently from what it does others who are in the same situation as he; that is, in the same relation to the *purpose of the statute. Gulf, etc., R. Co. v. Ellis*, 165 U. S., 150; *Atchison, etc., R. Co. v. Matthews*, 174 U. S., 103; *Lloyd v. Dollison*, 194 U. S., 445; *Halter v. Nebraska*, 205 U. S., 34; *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S., 78; *International Harvester Co. v. Missouri*, 234 U. S., 199. Const. of the U. S. of Amer., revised and anno. (1924), p. 724.

"It is settled that in tax matters a license tax is uniform when it is equal upon all persons belonging to the described class upon which it is imposed." Quoted in *Express Co. v. Charlotte*, 186 N. C., at p. 675.

It is held in *Bizzell v. Goldsboro*, 192 N. C., at p. 358: "The ordi-nances are far-reaching, and the law does not permit the enjoyment of one's property to depend upon the arbitrary or despotic will of officials, however well-meaning, or to restrict the individual's right of property or lawful business without a general or uniform rule applicable to all alike."

"The principle is well settled that ordinances must be uniform, fair, and impartial in their operation. They must be reasonable and not arbitrary. There can be no discrimination against those of the same class. The regulation must apply to all of a class. An ordinance that grants rights—the enjoyment must be to all, upon the same terms and conditions. An ordinance cannot penalize one, and for the same act, done under similar circumstances, impose no penalty. No ordinance is enforceable in matters of this kind, a lawful business, that does not make a general or uniform rule of equal rights to all and applicable to

all alike—then there can be no special privilege or favoritism. The right of individuals to engage in a lawful calling and use their property for lawful purposes is guaranteed to them," citing numerous cases. *Town of Clinton v. Standard Oil Co.,* 193 N. C., at p. 435; 137 S. E., 185.

McQuillin Municipal Corporations, 2 ed. (1928), sec. 775, lays down the principle thus: "Ordinances must be fair, impartial and uniform in their operation. Where privileges are granted by an ordinance, they should be open to the enjoyment of all upon the same terms and conditions. An ordinance cannot make a particular act penal when done by one person and impose no penalty for the same act done under like circumstances by another. . . . All discriminations in ordinances against those of the same class are bad. An ordinance must be general in its character and operate equally upon all persons within the municipality of the class to which it relates. No arbitrary distinction between different kinds and classes of business can be sustained, the conditions being otherwise similar."

In *S. v. Denson,* 189 N. C., at p. 175, *Adams, J.,* quotes as follows: " 'The specific regulations for one kind of business, which may be necessary for the protection of the public, can never be the just ground of complaint, because like restrictions are not imposed upon other business of a different kind. The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discrimination can be said to impair that equal right which all can claim in the enforcement of the laws.' *Mr. Justice Field,* in *Soon Hing v. Crowley,* 113 U. S., 703; 28 Law Ed., 1145." citing numerous authorities.

In *Harden v. Raleigh,* 192 N. C., at p. 398, it is said: "In the present case a tribunal was established and charged with duties, not ministerial, but at least *quasi*-judicial and subject to review as the statute prescribed."

I can see no reason why the same salutary principles in reference to property rights should not extend to a business devoted solely to rescuing the perishing by *soliciting alms* or *begging charity* for any *charitable purpose.* The exceptional cases are where it is difficult or impracticable to lay down a definite comprehensive rule or the police power is necessary to protect the public morals, health, safety and general welfare. Here the object is to aid in all these.

Francis Bacon, in his Essay "Of Goodness and Goodness of Nature," says: "The desire of power in excess caused the angels to fall; the desire of knowledge in excess caused man to fall; *but in charity there is no excess,* neither can angel nor man come in danger by it."

STATE v. HUNDLEY.

The defendants belonged to an organization, known as "The American Rescue Workers, Inc.," is a Christian Church and has been in existence since 1882. Its objects, in part; "(1) The character of the business is religious, home mission and philanthropic work.  (2) The dissemination of the Word of God to the masses not reached by ordinary church methods, and the amelioration of the lots of the widow and the fatherless, the cripples and all of God's children in need.  The American Rescue Workers are supported by voluntary contributions of those enjoying God's blessings to a greater extent than those in need. . . . . The American Rescue Workers is a nonsectarian organization that labors for the widowed mothers and fatherless children, preach the gospel, lift up the fallen and work for God and humanity." The American Rescue Workers are engaged in the work of administering to and taking care of the sick, the distressed, abandoned wife and children and, particularly, in furnishing a home and refuge for young girls who are about to be confined and have no place to go and no relatives or friends who can, or will, give aid.  Regular books are kept by the Rescue Workers of America, which show all contributions received, and all expenditures for whatsoever purpose, together with the nature and character of every patient admitted to the home or administered to elsewhere. In addition to the charitable work done by the Rescue Workers of America, as above indicated, regular religious services are held and religious instruction, undenominational and nonsectarian, is given daily. The Rescue Workers of America have no income except such voluntary contributions as may be received.  At the time the permit was refused, the organization had twelve girls in the home and three babies.  Not a penny is charged for taking in destitute girls or doing any other charitable work.  The Rescue Workers get only their necessities of life.  The American Rescue Workers' home was acting, at the time of the refusal of the permit, under the supervision of M. M. Gray, the county welfare officer.  Two or three of the girls were sent to the home by welfare officers.

The record discloses that E. E. Baker and W. B. Stuart each testified: "That I am familiar with the nature of the work of the American Rescue Workers in this city; that the persons here named are people of high character and integrity, and that the cause which they pursue and in which they are engaged is most worthy, and that the American Rescue Workers are filling a great need, not otherwise met, in a most praiseworthy manner."

M. M. Gray testified: "I am county superintendent of welfare for Mecklenburg County.  I know the Hundleys and The American Rescue Workers of Charlotte.  I know their reputation; it is good.  I know the reputation of their home; it is good."  Mr. Gray further made a state-

ment, in part: "There is no question whatever as to the need for such an institution here. . . . There are numbers of girls who need the care of such an institution and do not get it, nor are sent to a hospital. . . . Just from the standpoint of money saved to Charlotte and Mecklenburg County, such an institution is needed here, disregarding the number of girls in the adjacent territory, for whom such a place would be a Godsend. . . . It is pathetic that so much of the time and energy of so-called social workers is taken up fighting each other, when it ought to be used entirely in prosecuting their work of helping their fellowmen. Of course the welfare department is not directly concerned with the Salvation Army; still they are our friends, and are a great help to our work. The attitude of the Salvation Army toward the American Rescue Workers is doing the Salvation Army no good. That is true locally, and no doubt in the State at large."

It is admitted that the American Rescue Workers is a charitable organization; they, the defendants, solicited alms and funds upon the public streets of the city of Charlotte for distribution among the poor, and it is admitted they have solicited in Charlotte without a permit or without a license.

The record discloses: The city commissioner of public safety testified in part: "I think they are doing a worthy work as far as it goes, but I don't think they are working under proper conditions or surroundings. . . . I sent Chief West down there to make investigation at one time, and he said he did not see anything wrong from a police point of view. In all the reports I have, there was nothing against the morals of the place and nothing against the reputation of the people living in the home."

J. H. Brown testified: "I live in Concord. I have been for four years superintendent of public welfare for Cabarrus County. I know something about the reputation of the American Rescue Workers Home; it is good. I have sent girls here to this home. I could not get them in at any other place, and have sent them over here."

Mrs. Hundley testified in part: "Those girls are under my personal supervision all the time. I consider the work I am doing, taking those people into our home, a part of the religious doctrine of our church. If we were unmolested and left alone, the contributions and freewill offerings from the public would be sufficient to take care of our charitable, religious and benevolent work."

On the entire record, these two women defendants—women of the highest character and reputation beyond dispute—were fulfilling the ideal: "He hath sent me to heal the broken-hearted, to preach deliverance to the captives and recovering of sight to the blind, to set at liberty them that are bruised." The entire record shows defendants are worthy.

It was suggested in the argument that from the facts appearing on the record mandamus would lie to compel a permit; that the record showed a "clear present legal right." I go further, and from the authorities cited, I think the ordinance is void.

A similar case to the one at bar is *Ex parte Dart* (Cal.), 155 Pac., 63, L. R. A., 1916, D 905. The Salvation Army, in Los Angeles, Cal., an organization founded on the ideals of the Christian religion and its main object charity, was doing there a commendable work. An ordinance in many respects like the present one was passed by the authorities of Los Angeles. Section 2 is as follows: "It shall be unlawful for any person, firm, corporation or association to solicit alms, food, clothing, money or contributions within the city of Los Angeles, *without first securing a permit so to do from the Municipal Charities Commission of said city.* Provided, however, that the provisions of this section shall not apply to properly accredited solicitors of established churches of said city soliciting for purely religious purposes, but it shall apply to the various institutional works carried on by said churches in like manner as other persons, firms, corporations and associations. The permit from the charities commission above referred to shall consist of a written certificate issued by the said commission certifying that the *object of said solicitation is worthy and meritorious* and authorizing the soliciting of gifts and donations therefor, said permits may be revoked by said commission at any time." Dart was arrested for violating the ordinance. The Court said, at p. 65: "Nay, more in the city of Los Angeles itself its needy childhood goes unfed and unclothed, its dependent womanhood unprotected and uncared for by organized charities except they have a 'permit.' Surely here, if anywhere, is

'The organized charity, scrimped and iced,
In the name of a cautious, statistical Christ.' . . .

"(p. 66) The two religions exercising the most potent influence in shaping the material and spiritual destinies of the white-skinned races are the Jewish and the Christian. To these, as to all others, perfect freedom of exercise is constitutionally guaranteed. In both of these religions charity is the central word. It is enjoined, not as a good thing, or a wise thing, or as a kindly thing only, but as a fundamental part of the religion itself. . . . Does it need more, does it need so much, to show that in these religions the bestowal of charity, the devotion of life to charity, are a part of the religion itself? And does it demand discussion to establish so plain a truth as that touching religion there is a doubtful zone which legislation should be most reluctant to enter? The founders of the nation recognized it when they placed the great guaranty of religious liberty in the Constitution of a free people, and it is for

STATE *v.* HUNDLEY.

every court to see that liberty is not encroached upon and that freedom gnawed and impaired by any experimental legislation however well meant. So when legislation does enter that uncertain domain, the fact that it is there must bring to it condemnation. In accordance with the dictates of the Constitution itself, the doubt will be resolved in favor of religious liberty. And it will be found better in the long run that the free exercise of religion be preserved in its integrity, better for the nation, better for charity itself which owes so much to religion, even if the efficiency of religious charities be not up to the standard of perfection set by the Municipal Charities Commission. . . . (p. 67) Other methods of regulation may also be allowable; but a law or ordinance by or under which a lawful occupation, in itself, when properly conducted, in nowise injurious to persons, property, or the public interest, may be absolutely prohibited at the dictation of any official body without other cause than its own will or desire, is beyond the legislative power, and to that extent void."

From the record the Salvation Army was issued a permit, the American Rescue Workers denied one. We must construe the ordinance in its entirety. It does indirectly what the law says cannot be done directly. The sequence is that the Salvation Army is the "sole-seller" of charity (the definition of monopoly in the *Clinton case, supra*), in the city of Charlotte. They are worthy to solicit alms on the streets of Charlotte, the American Rescue Workers, Inc., cannot. This discrimination is dangerous to a free people. I do not question the good works of the Salvation Army; I am questioning the right to grant to them a special privilege and deny the American Rescue Workers, Inc., a like privilege. The ordinance is far-reaching in its effect. The good women or men of the Jewish persuasion may desire for their race to solicit alms for charity. The good women and men of some Protestant or non-Protestant body may desire for their particular faith to solicit for charity. Other organizations charitably inclined may desire to solicit for charity. The ordinance gives the power to the governing body in their discretion to kill or make alive. Such favoritism cannot be justified in law. The ordinance should be applicable to all alike, else it is void. Equal protection of the law implies the protection of equal laws.

The Associated Charities, the Salvation Army, the American Rescue Workers, and every other agency for good should be encouraged and allowed to pursue their high ideals of reclaiming the human wreckage. Charity should not be canned. "Main Street" requirements should not hamper the poor. There should be uniform regulations, and all similarly situated have "the equal protection of the laws" guaranteed by the Constitution.

I am authorized to say that MR. JUSTICE BROGDEN concurs in this dissent.