Opinion
GEORGE, C. J.
We granted the request of the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) for certification pursuant to California Rules of Court, rule 29.5 (rule 29.5), to address an important issue of state law: What is the proper standard under article I, section 2, subdivision (a) of the California Constitution (hereafter article I, section 2(a), or liberty of speech clause) for analyzing the constitutionality of ordinances governing the public solicitation of funds, i.e., in-person requests for the immediate donation or payment of money, such as City of Los Angeles Ordinance No. 171664?
Plaintiffs contend that ordinances that single out such solicitation for distinct treatment should be viewed as “content-based” regulations (and hence constitutionally suspect), and may be upheld under the California liberty of speech clause only if the regulation satisfies the very stringent “strict scrutiny” standard. In contrast, defendants contend that such ordinances should not be considered content based under the California Constitution, and instead should be evaluated under the less stringent “intermediate scrutiny” standard that California decisions traditionally have applied to “time, place, and manner” regulations of speech-related activity.
As we explain, this court’s decisions dating back more than 80 years have recognized that requests for the immediate donation or payment of money— *357 while often encompassed within and protected by the liberty of speech clause—may create distinct problems and risks that warrant different treatment and regulation. These precedents are inconsistent with plaintiffs’ claim that statutes or ordinances are to be viewed as constitutionally suspect simply because they are directed at such solicitation alone and do not apply to other forms of speech-related activity. Although some recent decisions of the California and federal intermediate appellate courts have concluded that, under the California Constitution, ordinances directed at solicitation should be viewed as content based and, for that reason, must satisfy the strict scrutiny test, those decisions rest on an erroneously literal interpretation of the phrase “content based” and fail to take into account long-established California decisions upholding ordinances or regulations that impose distinct rules or requirements upon activity involving the solicitation of funds.
Accordingly, we conclude that an ordinance (such as the Los Angeles ordinance at issue in the underlying action) that is directed at activity involving public solicitation for the immediate donation or payment of funds should not be considered content based or constitutionally suspect under the California Constitution, and should be evaluated under the intermediate scrutiny standard applicable to time, place, and manner regulations, rather than under the strict scrutiny standard.
I.
The pertinent facts are stated in the certification request of the Ninth Circuit (Los Angeles Alliance v. City of Los Angeles (9th Cir. 1998) 157 F.3d 1162, 1163-1164 (Los Angeles Alliance I)) as follows:
“On July 2, 1997, the Los Angeles City Council enacted Ordinance No. 171664 entitled ‘Prohibition Against Certain Forms of Aggressive Solicitation,’ codified as Los Angeles Municipal Code § 41.59. The ordinance . . . went into effect August 15, 1997. The stated goal of the ordinance is ‘to protect citizens from the fear and intimidation accompanying certain kinds of solicitation that have been an unwelcome and overwhelming presence in the city.’ The ordinance prohibits two kinds of solicitations—‘aggressive solicitations’ in all locations, § 41.59(b), and all solicitations in specific locations, § 41.59(c). . . . [¶] . . . [¶]
“[Plaintiffs] are groups and individuals that solicit immediate donations of money from members of the public on public fora throughout the City of Los Angeles. On September 11, 1997, [plaintiffs] brought an action for injunctive and declaratory relief to enjoin enforcement of the ordinance on the *358 grounds that it violates the First and Fourteenth Amendments of the United States Constitution and the Liberty of Speech Clause of the California Constitution. [Plaintiffs] then requested a preliminary injunction which the district court granted on November 5, 1997.
“The district court rejected [defendants’] argument for Pullman abstention [(.Railroad Comm’n v. Pullman Co. (1941) 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971])], concluded that [plaintiffs] were likely to succeed on the merits of their claim and found that [defendants] had conceded irreparable harm for purposes of the preliminary injunction. Relying on the California appellate decision in Alternatives [for California Women, Inc. v. County of Contra Costa (1983) 145 Cal.App.3d 436 [193 Cal.Rptr. 384] (Alternatives)] and on the Ninth Circuit’s decision in Carreras [v. City of Anaheim (9th Cir. 1985) 768 F.2d 1039 (Carreras)], the district court held that the ordinance was content-based under the California Liberty of Speech Clause [(and hence subject to strict, rather than intermediate, scrutiny)]. . . . [Defendants] timely appealed the grant of the preliminary injunction to the Ninth Circuit.” (Fns. omitted.)
II.
A.
The Ninth Circuit explained the need for certification in this matter as follows:
“The answer to the certified question will resolve a critical issue of whether the California Constitution’s Liberty of Speech Clause grants greater protection to speech used in conjunction with solicitation than does the First Amendment of the United States Constitution. Under federal constitutional law, regulations of solicitation are reviewed as content-neutral restraints of speech. See, e.g., United States v. Kokinda, 497 U.S. 720, 730, . . . [110 S.Ct. 3115, 3121-3122, 111 L.Ed.2d 571] (1990) [(Kokinda)]. In contrast, the California appellate court decision in Alternatives^ supra, 145 Cal.App.3d 436,] . . . [held] that regulations of solicitation are reviewed as content-based restraints of speech under the Liberty of Speech Clause of the California Constitution [and hence subject to strict scrutiny]. [¶] . . . [¶]
“[Subsequent to Alternatives, supra, 145 Cal.App.3d 436, but prior to Kokinda, supra, 497 U.S. 720, the court in Carreras, supra, 768 F.2d 1039,] . . . found that ‘Alternatives ... is most plausibly interpreted as independently grounded on the California Liberty of Speech Clause.’ 768 F.2d 1039, *359 1048 n. 21 . . . . Applying Alternatives, the [Carreras] court found that an ordinance [regulating solicitation] was content-based under the California Constitution [and hence subject to strict scrutiny]. Id. at 1048.
“. . . We must determine whether [,Alternatives, supra, 145 Cal.App.3d 436, and Carreras, supra, 768 F.2d 1039, or Kokinda, supra, 497 U.S. 720, properly reflects] the Supreme Court of California’s interpretation of California’s Liberty of Speech Clause, a critical issue in the appeal before us.” (Los Angeles Alliance I, supra, 157 F.3d 1162, 1164-1165.)
Finally, the Ninth Circuit stated that no decision of the California Supreme Court addresses whether “regulation of solicitation is content-neutral or content-based,” and it asserted that the California Court of Appeal cases on that issue “present conflicting views.” (Los Angeles Alliance I, supra, 157 F.3d 1162, 1165.)[1]
B.
The Ninth Circuit’s certification request formulated the question to be addressed as follows: “Is an ordinance that seeks to regulate the time, place and manner of solicitation of money or other thing of value or the sale of goods or services content based under the Liberty of Speech Clause of the California Constitution? Cal. Const. art. I, § 2.” (Los Angeles Alliance I, supra, 157 F.3d 1162, 1162-1163.) The certification request also specified, however, that its “phrasing of the question should not restrict [this] Court’s consideration of the issue involved.” (Id., at p. 1163.)
The Ninth Circuit concluded: “Although we currently have under review the grant of a preliminary injunction, certification is proper because the *360 challenge to the regulation is a facial one and so there are no additional facts relevant to the certified question to be litigated before the district court. The answer to the certified question may be determinative of the cause pending before this panel. [¶] This court agrees to follow the answer provided by the California Supreme Court.” (Los Angeles Alliance I, supra, 157 F.3d 1162, 1165.) Pursuant to rule 29.5, the Ninth Circuit ordered its clerk to “provide all relevant briefs and excerpts of record with this request and to forward all under the official seal of the Ninth Circuit. . . .” (157 F.3d at p. 1165; see rule 29.5 (c) & (d).)
We granted the certification request, and, at the same time, modified the certified question to read as follows: “What is the proper standard under article I, section 2(a) of the California Constitution for analyzing the constitutionality of ordinances governing solicitations, such as Los Angeles Ordinance No. 171664?”[2]
C.
Until the adoption of rule 29.5, effective January 1, 1998, California was one of the few states in the nation that did not accept certified questions of state law. Because this is the first instance in which we have accepted a request for certification, we make the following brief observations. Many commentators have noted the benefits of certification. The procedure (i) allows federal courts to avoid mischaracterizing state law (thereby avoiding a misstatement that might produce an injustice in the particular case and potentially mislead other federal and state courts until the state supreme court finally, in other litigation, corrects the error); (ii) strengthens the primacy of the state supreme court in interpreting state law by giving it the *361 first opportunity to conclusively decide an issue; (iii) avoids conflicts between federal and state courts, and forestalls needless litigation; and (iv) protects the sovereignty of state courts.[3] (See, e.g., Braun, A Certification Rule for California (1996) 36 Santa Clara L.Rev. 935, 937-942 (Braun); Schneider, “But Answer Came There None”: The Michigan Supreme Court and the Certified Question of State Law (1995) 41 Wayne L.Rev. 273, 299-301; see also Goldschmidt, Certification of Questions of Law: Federalism in Practice (Amer. Judicature Soc'y. 1995) pp. 3-10.)
The need for a certification procedure is well illustrated in this case by the above described history of Alternatives, supra, 145 Cal.App.3d 436, and Carreras, supra, 768 F.2d 1039. In light of the Ninth Circuit’s decision in Carreras, individuals and organizations that wish to challenge solicitation ordinances in California have every incentive to bring state constitutional challenges to such ordinances in federal district court, where they will receive the benefit of Carreras's holding that such ordinances are content based and hence subject to strict scrutiny under the California Constitution.[4] Because Carreras is binding on the federal courts in California but not on California state courts, plaintiffs are unlikely to present this state claim in state court and risk a determination by a state court that Carreras was wrongly decided, when they are more likely to prevail, on the strength of Carreras, in federal district court. In this setting, the availability of a certification procedure provides the most expeditious, and, as a practical matter, perhaps the only effective, means to enable California, through its courts, to exercise the state’s authority over the proper interpretation and application of article I, section 2(a), of its own Constitution.
The parties do not contest the constitutionality of the certification procedure embodied in rule 29.5. Sister courts in states with constitutions similar to the California Constitution uniformly have found that jurisdiction to entertain and decide certified questions, under a procedure adopted by rule or statute, is properly within the powers of a state supreme court. (E.g., In re Elliott (1968) 74 Wash.2d 600 [446 P.2d 347, 358] (Elliott); Sunshine Mining Co. v. Allendale Mut. Ins. (1983) 105 Idaho 133 [666 P.2d 1144, 1147-1148]; see also Irion v. Glens Falls Insurance Company (1969) 154 Mont. 156 [461 P.2d 199, 203]; see generally Braun, supra, 36 Santa Clara L.Rev. 935, *362 947-951.) Similarly, our sister-state high courts overwhelmingly have rejected contentions that in answering a certified question a court issues an improper advisory opinion. The weight of authority holds that a high court’s answer to a certified question is not an improper advisory opinion so long as (i) a court addresses only issues that are truly contested by the parties and are presented on a factual record; and (ii) the court’s opinion on the certified question will be dispositive of the issue, and res judicata between the parties. (See, e.g., Schlieter v. Carlos (1989) 108 N.M. 507 [775 P.2d 709, 710]; Wolner v. Mahaska Industries, Inc. (Minn. 1982) 325 N.W.2d 39, 41; Elliott, supra, 446 P.2d 347, 354-355; see generally Braun, supra, 36 Santa Clara L.Rev. 935, 947.)[5] No party or other entity asserts that we should conclude otherwise under the judicial article of our own Constitution.
III.
To place the present controversy in perspective, we first highlight significant aspects of the Los Angeles ordinance at issue in the federal proceeding.
A.
The ordinance and its preamble are set out in full in the appendix to this opinion. (L.A. Ord. No. 171664; L.A. Mun. Code, § 41.59 [hereafter § 41.59.].) The preamble articulates the city’s purposes: “[I]t is the intent of the Council in enacting this Ordinance to improve the quality of life and economic vitality of the City, and to protect the safety of the general public against certain abusive conduct of persons engaged in solicitation, by imposing reasonable manner and place restrictions on solicitation while respecting the constitutional rights of free speech for all citizens . . . .”
The preamble also sets out a number of findings: First, “an increase in aggressive solicitation throughout the city has become extremely disturbing and disruptive to residents and businesses, and has contributed not only to the loss of access to and enjoyment of public places, but also to an enhanced sense of fear, intimidation and disorder . . . .” Second, “the presence of individuals who solicit money from persons at or near banks or automated teller machines is especially threatening and dangerous. Motorists also find themselves confronted by persons who without permission wash their automobile windows at traffic intersections, despite explicit indications by drivers not to do so. Such activity often carries with it an implicit threat to both *363 person and property. People driving or parking on city streets frequently find themselves faced with panhandlers seeking money by offering to perform ‘services’ such as opening car doors or locating parking spaces . . . .” Finally, “the Council . . . finds as abusive the solicitation of people in places where they are a ‘captive audience’ in which it is impossible or difficult for them to exercise their own right to decline to listen to or to avoid solicitation from others. Such places include buses, subways, and trains; parking lots and structures; and indoor and outdoor dining areas. Restricting solicitation in such places will provide a balance between the rights of solicitors and the rights of persons who wish to decline or avoid such solicitations, and will help avoid or diminish the threat of violence in such unwarranted and unavoidable confrontations . . . .”
B.
The ordinance is directed at those who “ ‘[s]olicit, ask or beg’ ” by “using the spoken, written, or printed word, or bodily gestures, signs or other means with the purpose of obtaining an immediate donation of money or other thing of value . . . .” (L.A. Ord. No. 171664; § 41.59, subd. (a)(1), italics added.) The measure also covers solicitation for the sale of “goods or services” (ibid.)—which would appear to include the sale of books, newspapers, tracts, artwork, etc., as well as the sale of “services,” such as the washing of automobile windows. It applies in “ ‘public place[s],’ ” defined as places (whether publicly or privately owned) where the public is afforded access, including streets, sidewalks, parking lots, plazas, transportation facilities, schools, places of amusement, parks, and any portion of any business establishment. (Id., subd. (a)(2).)
Consistent with the city’s stated purpose and findings, the ordinance covers two categories of solicitation. First, with respect to all public places covered by the ordinance, the legislation bans solicitation that is conducted in an “aggressive manner,” which is defined in detail as approaching, speaking to, or following a person in a manner intended to cause or reasonably likely to cause fear of bodily harm or intimidation; intentionally touching in the course of soliciting; intentionally blocking or interfering with passage; using violent or threatening gestures; persisting in closely following after being informed that the person does not want to donate; or using profane, offensive, or abusive language likely to provoke an immediate violent reaction. (L.A. Ord. No. 171664; § 41.59, subd. (b)(2)(A)-(F).)
Second, the ordinance bans all solicitation in certain defined places (with specified exemptions): within 15 feet of banks and automated teller machines; directed at occupied motor vehicles located in a public place; in *364 parking lots or structures after dark; in public transportation vehicles and within 10 feet of such vehicle stops; and in any outdoor or indoor dining area of a restaurant. (L.A. Ord. No. 171664; § 41.59, subd. (c)(1)-(4).)
IV.
A.
An ordinance such as the one here at issue plainly implicates the liberty of speech clause of the California Constitution. (People v. Fogelson (1978) 21 Cal.3d 158 [145 Cal.Rptr. 542, 577 P.2d 677] (Fogelson) [ordinance regulating solicitation on city property posed an impermissible restriction on speech under art. I, § 2].)[6]
 The circumstance that an ordinance regulates protected conduct does not in itself, however, render the ordinance invalid under the liberty of speech clause. California decisions long have recognized that even with regard to protected activity, a regulation may be enforceable if it survives the intermediate scrutiny of time, place, and manner analysis. As observed in Savage v. Trammell Crow Co. (1990) 223 Cal.App.3d 1562, 1572-1574 [273 Cal.Rptr. 302] (Savage), legislation will be upheld as a reasonable time, place, and manner regulation so long as it is
(i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. (See e.g., Dulaney v. Municipal Court (1974) 11 Cal.3d 77, 84-85 [112 Cal.Rptr. 777, 520 P.2d 1] (Dulaney).)[7]
As plaintiffs note, decisions applying the liberty of speech clause, like those applying the First Amendment, long have recognized that in order to *365 qualify for intermediate scrutiny (i.e., time, place, and manner) review, a regulation must be “content neutral” (e.g., Savage, supra, 223 Cal.App.3d at p. 1573), and that if a regulation is content based, it is subject to the more stringent strict scrutiny standard. (E.g., U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory (1984) 154 Cal.App.3d 1157, 1170 [201 Cal.Rptr. 837] (U.C. Nuclear Weapons).)[8]
 Plaintiffs, relying primarily upon Alternatives, supra, 145 Cal.App.3d 436, contend that a regulation that singles out for distinct treatment public solicitation for immediate donation or payment of funds, and regulates only such activity and not any other expressive activity (such as the distribution of leaflets or public speechmaking), should be viewed as content based under the California Constitution, and hence should be subject to strict, rather than intermediate, scrutiny. Defendants, on the other hand, relying heavily upon the reasoning of a line of United States Supreme Court decisions (Lee, supra, 505 U.S. 672; Kokinda, supra, 497 U.S. 720; Heffron, supra, 452 U.S. 640), assert that legislation like the Los Angeles ordinance here at issue should be designated content neutral, and hence properly may be reviewed under the California liberty of speech clause by intermediate scrutiny under time, place, and manner analysis.
B.
In analyzing whether a regulation of solicitation should be viewed as content based or content neutral under the liberty of speech clause of the California Constitution, we begin with the unquestioned proposition that the California Constitution is an independent document and its constitutional protections are separate from and not dependent upon the federal Constitution, even when the language of the two charters is the same. (Cal. Const., art. I, § 24.) In this instance, the language of the relevant California constitutional provision differs from, and in some respects is broader than, the federal Constitution. Whereas the First Amendment to the United States Constitution, in relevant part, provides that government “shall make no law . . . abridging the freedom of speech,” article I, section 2(a), of the California Constitution reads: “Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right. A law may not restrain or abridge liberty of speech or press.” This provision, often referred to as the “liberty of speech clause,” was adopted without debate in the first California Constitution of 1849 (see Browne, *366 Report of the Debates in The Convention of California on the Formation of the State Constitution (1850) pp. 41, 294, 458 (hereafter Browne, Report of the Debates (1850)), and has remained essentially unchanged since then.[9]
Most current state constitutions have similarly worded provisions,[10] and courts in these states frequently have observed that the language of their provisions is broader than that of the freedom of speech provision of the First Amendment. (E.g., State v. Linares (1995) 232 Conn. 345 [655 A.2d 737, 753-757]; Davenport v. Garcia (Tex. 1992) 834 S.W.2d 4, 7-12; Mountain States Tel. v. Corp. Com'n (1989) 160 Ariz. 350 [773 P.2d 455, 459-462]; State v. Henry (1987) 302 Or. 510 [732 P.2d 9, 11]; Alderwood Assoc. v. Wash. Envir. Council (1981) 96 Wash.2d 230 [635 P.2d 108, 115-116]; State v. Schmid (1980) 84 N.J. 535 [423 A.2d 615, 626-627]; Village of South Holland v. Stein (1940) 371 I11. 472 [26 N.E.2d 868, 871, 127 A.L.R. 957].)[11]
This court, and the California Courts of Appeal, likewise have indicated that the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment. (Dailey v. Superior Court (1896) 112 Cal. 94, 97-98 [44 P. 458] [the liberty of speech clause “is the broader, and gives . . . greater liberty” than the First Amendment]; *367 Griset v. Fair Political Practices Com. (1994) 8 Cal.4th 851, 866, fn. 5 [35 Cal.Rptr.2d 659, 884 P.2d 116] [“As a general matter, the liberty of speech clause in the California Constitution is more protective of speech than its federal counterpart”]; Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 519 [217 Cal.Rptr. 225, 703 P.2d 1119] [liberty of speech clause is “ ‘more definitive and inclusive than the First Amendment’ ”]; People v. Glaze (1980) 27 Cal.3d 841, 844, fn. 2 [166 Cal.Rptr. 859, 614 P.2d 291] [same]; Wilson v. Superior Court (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116] [same]; see generally Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341]; see also San Diego Unified Port Dist. v. U.S. Citizens Patrol (1998) 63 Cal.App.4th 964, 970 [74 Cal.Rptr.2d 364]; Allred v. Shawley (1991) 232 Cal.App.3d 1489, 1496 [284 Cal.Rptr. 140]; Gonzales v. Superior Court (1986) 180 Cal.App.3d 1116, 1123 [226 Cal.Rptr. 164]; U.C. Nuclear Weapons, supra, 154 Cal.App.3d 1157, 1164; Prisoners Union v. Department of Corrections (1982) 135 Cal.App.3d 930, 938 [185 Cal.Rptr. 634].)
Merely because our provision is worded more expansively and has been interpreted as more protective than the First Amendment, however, does not mean that it is broader than the First Amendment in all its applications.[12] In this regard, defendants acknowledge that the California Constitution is independent and that federal decisions interpreting the First Amendment are not controlling. They argue, however, that with respect to analysis of solicitation statutes, federal authorities are persuasive and are supportive of the treatment generally accorded by past California decisions.
C.
I.
We first describe the high court’s test for determining content neutrality for purposes of the First Amendment. In deciding whether, under the First Amendment, a given regulation of speech or expressive activity is content based, and hence subject to strict scrutiny, or instead is content neutral, and hence subject to intermediate scrutiny (i.e., time, place, and manner analysis), the high court has stated that a restriction is content neutral if it is “justified without reference to the content of the regulated speech.” (Clark v. Community for Creative Non-Violence (1984) 468 U.S. 288, 293 [104 S.Ct. 3065, 3069, 82 L.Ed.2d 221]; see also Ward, supra, 491 *368 U.S. 781, 791 [109 S.Ct. 2746, 2753-2754]; Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 428 [113 S.Ct. 1505, 1516, 123 L.Ed.2d 99].)
The high court’s cases illuminate what it meant by this statement. Contrary to plaintiffs’ view, these decisions do not require literal or absolute content neutrality, but instead require only that the regulation be “justified” by legitimate concerns that are unrelated to any “disagreement with the message” conveyed by the speech. (Ward, supra, 491 U.S. 781, 791 [109 S.Ct. 2746, 2754].) Moreover, the high court’s decisions contemplate that a regulation will be found content neutral even if it may have disparate incidental effects on speakers based upon message content. As the court explained in Ward, “[a] regulation that serves purposes unrelated to the content of the expression” (there, New York City’s Central Park sound amplification restrictions designed to avoid undue intrusion into other areas of the park and surrounding neighborhoods) “is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.” (491 U.S. at p. 791 [109 S.Ct. at p. 2754];[13] see also Williams, supra, 139 U.Pa. L.Rev. 615, 622-635 [describing and criticizing this “limited notion of content discrimination”].)
The three high court decisions that have addressed the question of content neutrality in the context of solicitation all have classified such laws as being content neutral, even though the laws at issue in those cases distinguished between speech that solicited the immediate donation of money and other protected speech, and thus were not totally unconcerned with the literal content of spoken or written words.
Heffron, supra, 452 U.S. 640, concerned a regulation in a public forum, a state fair, that permitted the activities of conducting sales and soliciting funds only in designated booths. The regulation did not prevent an individual from walking about the grounds and communicating views to fair patrons in *369 face-to-face discussions. (Id., at pp. 643-644 [101 S.Ct. at pp. 2561-2562].) Even though the regulation at issue in Heffron made essentially the same distinction between solicitation and other speech that plaintiffs here assert is content based, the court in Heffron, with little analysis, held that the regulation was content neutral (id., at pp. 648-649 [101 S.Ct. at pp. 2564-2565]), and nothing in either of the two concurring and dissenting opinions took issue with that crucial holding. Indeed, Justice Brennan’s separate opinion expressly joined the court’s judgment “insofar as it upholds [the challenged] restriction on sales and solicitations” (id., at p. 657 [101 S.Ct. at p. 2569] (cone. & dis. opn. of Brennan, J.)), and Justice Blackmun’s separate opinion did likewise (id., at p. 663 [101 S.Ct. at p. 2572] (cone. & dis. opn. of Blackmun, J.)). In this regard, Justice Blackmun noted the “common-sense differences between literature distribution, on the one hand, and solicitation and sales, on the other,” and explained that “the latter activities present greater crowd control problems than the former. The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time. For this reason, literature distribution may present even fewer crowd control problems than the oral proselytizing that the State already allows upon the fairgrounds. In contrast, . . . sales and the collection of solicited funds not only require the fairgoer to stop, but also ‘engender additional confusion . . . because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc.’ ” (Id., at p. 665 [101 S.Ct. at p. 2573] (cone. & dis. opn. of Blackmun, J.).)
The court next addressed the content-neutrality issue in Kokinda, supra, 497 U.S. 720. There, four members of the court concluded that the place at which solicitation was barred, a walkway on postal department property leading from a parking lot to a post office, was not a public forum, and hence the solicitation ban could be upheld so long as it was reasonable and not an effort to discriminate on the basis of viewpoint. (Id., at pp. 726-730 [110 S.Ct. at pp. 3119-3122].) Nevertheless, the plurality addressed the issue of content neutrality, twice stating that the solicitation ban was content neutral. The plurality first observed that solicitation is “unquestionably a particular form of speech that is disruptive of business. Solicitation impedes the normal flow of traffic. See Heffron, supra, [452 U.S. at page] 653 [101 S.Ct. at pages 2566-2567]. Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor’s literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card.” (Kokinda, supra, 491 U.S. 720, 733-734 [110 S.Ct. 3115, 3123].) Thereafter the Kokinda plurality *370 stated: “It is the inherent nature of solicitation itself, a content-neutral ground, that the [Postal] Service justifiably relies upon when it concludes that solicitation is disruptive of its business. . . . [¶] Clearly, the regulation does not discriminate on the basis of content or viewpoint.’ ” (Id., at p. 736 [110 S.Ct. at p. 3124], italics added.)
Justice Kennedy, providing the fifth vote for the judgment in Kokinda, concurred separately to state his view that although he found the walkway to be a public forum under a “basic incompatibility” forum analysis, he nevertheless concluded that the challenged restriction was proper because it was content neutral and a permissible time, place, and manner regulation. (Kokinda, supra, 497 U.S. 720, 737 [110 S.Ct. 3115, 3125] (conc. opn. of Kennedy, J.).) In reaching that conclusion, Justice Kennedy stressed the narrow purpose and scope of the regulation, observing that it “expressly permits the respondents and all others to engage in political speech on topics of their choice and to distribute literature soliciting support, including money contributions, provided there is no in-person solicitation for payments on the premises. . . . [¶] Just as the government has a significant interest in preventing ‘visual blight’ in its cities, [citation], in ‘maintaining [public] parks . . . in an attractive and intact condition,’ [citation], and in ‘avoiding congestion and maintaining the orderly movement’ of persons using a public forum, [citation], so the Government here has a significant interest in protecting the integrity of the purposes to which it has dedicated the property, that is, facilitating its customers’ postal transactions. Given the Postal Service’s past experience with expressive activity on its property, I cannot reject its judgment that in-person solicitation deserves different treatment from alternative forms of solicitation and expression. [Citation.] The same judgment has been made for the classic public forums in our Nation’s capital. The solicitation of money is banned in the District of Columbia on the Mall and other parks under the control of the National Park Service. [Citation.] [¶] The Postal Service regulation, narrow in its purpose, design, and effect, does not discriminate on the basis of content or viewpoint, is narrowly drawn to serve an important governmental interest, and permits respondents to engage in a broad range of activity to express their views, including the solicitation of financial support.” (Id., at pp. 738-739 [110 S.Ct. at p. 3126], italics added.)
Three justices joined Justice Brennan in dissent, taking issue with (i) the plurality’s public forum analysis and conclusion (Kokinda, supra, 497 U.S. 720, 740-752 [110 S.Ct. 3115, 3126-3133] (dis. opn. of Brennan, J.)) and (ii) the majority’s characterization of the solicitation regulation as being content neutral (id., at pp. 752-755 [110 S.Ct. at pp. 3133-3135]). On the latter point, *371 the dissent advanced the same literal reading of the phrase “content neutral” here asserted by plaintiffs. The dissenters argued that “[t]he regulation is not content neutral. . . [because] it is tied explicitly to the content of speech. If a person on postal premises says to members of the public, ‘Please support my political advocacy group,’ he cannot be punished. If he says, ‘Please contribute $10,’ he is subject to criminal prosecution. His punishment depends entirely on what he says.” (Id., at p. 753 [110 S.Ct. at p. 3134].)
The question whether a law regulating solicitation is content based or content neutral arose again in Lee, supra, 505 U.S. 672. There, a majority of the court held that the terminals of New York City’s three international airports were neither traditional nor designated public forums, thus finding it unnecessary to address whether the challenged regulations (bans on, among other things, solicitation for the immediate payment of money) were content based. The point was addressed, however, in Justice Kennedy’s concurring opinion, because he concluded—as he had done in Kokinda—that under a basic incompatibility analysis, the forums were indeed public ones. On the question of content neutrality, Justice Kennedy observed: “If the . . . solicitation regulation prohibited all speech that requested the contribution of funds, I would conclude that it was a direct, content-based restriction of speech in clear violation of the First Amendment. The . . . regulation does not prohibit all solicitation, however; it prohibits the ‘solicitation and receipt of funds.’ I do not understand this regulation to prohibit all speech that solicits funds. It reaches only personal solicitations for immediate payment of money. . . . The regulation does not cover, for example, the distribution of preaddressed envelopes along with a plea to contribute money to the distributor or his organization. As I understand the restriction it is directed only at the physical exchange of money, which is an element of conduct interwoven with otherwise expressive solicitation. In other words, the regulation permits expression that solicits funds, but limits the manner of that expression to forms other than the immediate receipt of money.” (Lee, supra, 505 U.S. 672, 704-705 [112 S.Ct. 2701, 2721] (conc. opn. of Kennedy, J.), italics added.)
Justice Kennedy continued: “So viewed, I believe the . . . rule survives our test for speech restrictions in the public forum. In-person solicitation of funds, when combined with immediate receipt of that money, creates a risk of fraud and duress that is well recognized, and that is different in kind from other forms of expression or conduct. ... I would add that our precedents, as well as the actions of coordinate branches of Government, support this conclusion...We have in the past recognized that in-person solicitation has been associated with coercive or fraudulent conduct. Cantwell v. Connecticut, 310 U.S. 296, 306 [60 S.Ct. 900, 904, 84 L.Ed. 1213,128 A.L.R. 1352], *372 (1940); Riley, supra, [487 U.S.] at 800 [108 S.Ct. at pp. 2679-2680]; Heffron[, supra], 452 U.S. 640, 657 [101 S.Ct. at pp. 2568-2569] . . . (Brennan, J., concurring in part and dissenting in part); Schaumburg, supra, 444 U.S. at 636-638 [100 S.Ct. at pp. 835-837]. In addition, the Federal Government has adopted regulations which acknowledge and respond to the serious problems associated with solicitation. The National Park Service has enacted a flat ban on the direct solicitation of money in the parks of the Nation’s capital within its control. [Citations.] Also, the Federal Aviation Administration, in its administration of the airports of Washington, D. C., even while permitting the solicitation of funds has adopted special rules to prevent coercive, harassing, or repetitious behavior. [Citation.] And in the commercial sphere, the Federal Trade Commission has long held that ‘it constitutes an unfair and deceptive act or practice’ to make a door-to-door sale without allowing the buyer a 3-day ‘cooling-off period’ during which time he or she may cancel the sale. [Citation.] All of these measures are based on a recognition that requests for immediate payment of money create a strong potential for fraud or undue pressure, in part because of the lack of time for reflection. As.the Court recounts, questionable practices associated with solicitation can include the targeting of vulnerable and easily coerced persons, misrepresentation of the solicitor’s cause, and outright theft. . . . [¶] Because the . . . solicitation ban is directed at these abusive practices and not at any particular message, idea, or form of speech, the regulation is a content-neutral rule serving a significant government interest. We have held that the content neutrality of a rule must be assessed based on whether it is ‘ “justified without reference to the content of the regulated speech.” ’ Ward, [supra,] 491 U.S., at 791 [109 S.Ct. at p. 2754] . . . . It is apparent that the justification for the solicitation ban is unrelated to the content of speech or the identity of the speaker.” (Lee, supra, 505 U.S. 672, 705-706 [112 S.Ct. 2701, 2721-2722], italics omitted (conc. opn. of Kennedy, J.).)
The dissent in Lee, supra, 505 U.S. 672, 709 [112 S.Ct. 2701, 2723-2724] (dis. opn. of Souter, J., joined by Blackmun & Stevens, JJ.), did not contest the conclusion that the solicitation ban was content neutral, but instead merely assumed arguendo that it was (id., at p. 712 [112 S.Ct. at p. 2725]), and challenged the majority’s public forum analysis (id., at pp. 709-711 [112 S.Ct. at pp. 2723-2725]) and its conclusion that the regulations satisfied the intermediate scrutiny of time, place, and manner analysis (id., at pp. 712-715 [112 S.Ct. at pp. 2725-2727]).
Viewed together, these high court opinions establish that a restriction on solicitation for immediate donation or exchange of funds may be found to be content neutral for purposes of the First Amendment even if the measure *373 regulates such solicitation while leaving other types of speech untouched, so long as the regulation predominantly is addressed to the inherently intrusive and potentially coercive nature of that kind of speech, and not to the content of the speech. (See Doucette, supra, 955 F.Supp. 1192, 1204, citing Kokinda, supra, 497 U.S. at p. 736 [110 S.Ct. at pp. 3124-3125].) Moreover, as observed in Doucette, the high court has found such regulations to be content neutral “even though it could be argued that solicitation is more disruptive only because of its content and the attendant reactions that such content provokes. See Kokinda, [supra, 497 U.S. at page] 754 [110 S.Ct. at page 3134] (Brennan, J., dissenting).” (Doucette, supra, 955 F.Supp. at p. 1204.)[14] The competing literal approach to determining content neutrality appears to be at odds with the high court’s general desire for narrow tailoring in this area, and seems inconsistent with that court’s oft-repeated statements that content neutrality turns on whether the regulation is “justified” by legitimate concerns that are unrelated to any “disagreement with the message” conveyed by the speech (Ward, supra, 491 U.S. 781, 791 [109 S.Ct. 2746, 2754]), and that such a regulation will be found content neutral “even if it has an incidental effect on some speakers or messages but not others.” (Ibid.)
All lower court decisions of which we are aware, applying the First Amendment in this context, similarly have held (in reliance upon the opinions in Heffron, Kokinda, and Lee) that laws targeting solicitations but not other speech are nevertheless content neutral. (Xiloj-Itzep, supra, 24 Cal.App.4th 620, 636-638; ISKON of Potomac, Inc. v. Kennedy (D.C. Cir. 1995) 61 F.3d 949, 954-955 [314 App.D.C. 63]; ACORN v. City of Phoenix (9th Cir. 1986) 798 F.2d 1260, 1267-1271; Doucette, supra, 955 F.Supp. 1192, 1204; see also Smith v. City of Fort Lauderdale, Fla. (11th Cir. 1999) 177 F.3d 954, 956 [plaintiffs conceded that solicitation ordinance was content neutral].)[15] It is apparent that under the First Amendment the type of solicitation regulation at issue in the case before us is to be viewed as content neutral (and hence should be subject to intermediate, rather than strict scrutiny) so long as the regulation is justified without reference to the content of the regulated speech and is viewpoint neutral.
*374 2.
Alternatives, supra, 145 Cal.App.3d 436, comes to a different conclusion, relying almost exclusively upon a literal interpretation of the phrase “content neutral.” In Alternatives, the court invalidated an ordinance that banned door-to-door charitable solicitation after sundown. The court found the ordinance to embody a “ ‘content-based discrimination between . . . categories of speech’ in that it ‘distinguishes between speech merely conveying information on the one hand and speech conveying information in conjunction with a request for funds or contributions on the other.’ ” (Id., at p. 450.) The court’s analysis in Alternatives was based exclusively upon three high court First Amendment cases, none of which involved solicitation. (Ibid.) In a footnote, however, the court in Alternatives stated that its analysis applied to the “free speech provisions of the United States and California Constitutions alike.” (Id., at p. 448, fn. 7.) For this reason, Alternatives has been construed as being independently grounded on article I, section 2(a), of the California Constitution, as well as on the First Amendment. (Carreras, supra, 768 F.2d 1039, 1048; ISKCon, supra, 966 F.Supp. 956, 969; Berkeley Community, supra, 902 F.Supp. 1084, 1090-1091; Church of the Soldiers, supra, 886 F.Supp. 721, 725; see also City of Fresno, supra, 31 Cal.App.4th 32, 36.)
It may be questioned whether Alternatives, supra, 145 Cal.App.3d 436, represented a correct interpretation of the First Amendment at the time that decision was issued. Heffron, supra, 452 U.S. 640, in which the high court found a solicitation restriction to be content neutral, was decided two years before Alternatives but was not cited or discussed therein. Moreover, it seems clear that Alternatives does not accurately reflect the state of First Amendment law today.
In any event, as we shall explain, we believe that the court’s conclusion in Alternatives with respect to the liberty of speech clause of the California Constitution was erroneous for two fundamental reasons.
a.
First, Alternatives, supra, 145 Cal.App.3d 436, failed to take into account the considerable body of California decisions that have evaluated solicitation regulations. As explained below, those cases do not suggest that a regulation that singles out solicitation is constitutionally suspect.
In Matter of Application of Dart (1916) 172 Cal. 47 [155 P. 63] (Dart), this court invalidated municipal ordinances that gave a local licensing commission absolute and standardless power to deny the right to solicit on behalf of *375 a private charity. At the same time, however, the court clearly explained that the activity of soliciting funds may be regulated by a properly written ordinance: “The occupation of soliciting contributions to charitable purposes is clearly so far subject to the police power, that it may be regulated by laws or ordinances providing for a reasonable supervision over the persons engaged therein, and for the application and use of the contributions received to the purposes intended, in order to prevent unscrupulous persons from obtaining money, or other things, under the pretense that they were to be applied to charity, and to prevent the wrongful diversion of such funds to other uses, or to secure them against waste. Measures reasonably tending to secure these ends are unquestionably valid.” (Id., at p. 56 (conc. opn. of Shaw, J., speaking for maj. of court).)
We quoted with approval this passage of Dart, in Gospel Army v. City of Los Angeles (1945) 27 Cal.2d 232 [163 P.2d 704] (Gospel Army), a case in which we upheld, under the federal and state Constitutions, a local ordinance regulating charitable solicitors. In Gospel Army, we contrasted the regulation at issue in that case with a legislative measure regulating persons who solicit union membership that had been invalidated in Thomas v. Collins (1945) 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430], noting that the court in Thomas “was careful... to distinguish cases in which the speaker solicits funds from the public: ‘Once the speaker goes further, however, and engages in conduct which amounts to more than the right of free discussion comprehends, as when he undertakes the collection of funds or securing subscriptions, he enters a realm where a reasonable registration or identification requirement may be imposed.....[This would constitute] free speech plus conduct akin to the activities [that] ... the State might regulate . . . . ’ In his concurring opinion in Thomas v. Collins Mr. Justice Jackson gives the following reasons for these variations in state power: ‘This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modem state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. . . .’ ” (Gospel Army, supra, 27 Cal.2d at p. 247, italics added.) In these passages, Gospel Army makes clear that a legislative body does not act in a constitutionally suspect manner in singling out the solicitation of funds for distinct treatment. (Accord, Rescue Army v. Municipal Court (1946) 28 Cal.2d 460, 467 et seq. [171 P.2d 8].)
More recently, and to the same effect, in Fogelson, supra, 21 Cal.3d 158, we held unconstitutional under the federal and state charters an ordinance *376 requiring a permit to solicit on city property. Although we found the legislation at issue in that case unconstitutional for failing to provide licensing officials with sufficiently definite and objective guidelines for issuing licenses (id., at pp. 166-167), we stressed that “[t]he mere fact that the challenged ordinance attempts to regulate constitutionally protected speech . . . does not, of course, render it unconstitutional. . . . The state may, for example, reasonably regulate the time, place and manner of engaging in solicitation in public places. [Citations.] The state may also reasonably and narrowly regulate solicitations in order to prevent fraud (see, e.g., Gospel Army[, supra,] 27 Cal.2d 232 ...) or to prevent undue harassment of passersby or interference with the business operations being conducted on the property (see, e.g., In re Hoffman (1967) 67 Cal.2d 845, 851-852 [64 Cal.Rptr. 97, 434 P.2d 353]).” (Fogelson, supra, 21 Cal.3d at pp. 165-166, italics added.) Consistent with this view, Justice Mosk observed in his concurring opinion in Fogelson that “while the instant municipal ordinance falters because of constitutional infirmity, it is not impossible for the city to reasonably regulate the public conduct of mendicants” and that “[n]othing in the court’s opinion should deter the city from appropriately legislating if the public welfare so dictates.” (Id., at pp. 168-169 (conc. opn. of Mosk, J.).) Fogleson thus makes it clear that legislation imposing distinct requirements on solicitations is not constitutionally suspect.
As the foregoing decisions demonstrate, this court has not suggested that legislative measures directed at public solicitation of funds are constitutionally suspect merely because they do not impose the same requirements on other forms of free expression, nor have we suggested that an ordinance directed at public solicitation of funds is a content-based regulation that must be specially justified under the strict scrutiny standard.
b.
Second, the court’s literal approach in Alternatives to the content-based doctrine also ignores the theoretical underpinnings of that doctrine and the reasons content-based distinctions are constitutionally suspect. The cases of Danskin v. San Diego Unified Sch. Dist. (1946) 28 Cal.2d 536 [171 P.2d 885] (Danskin), in which we invalidated under the federal and state charters a statute that permitted the use of public school meeting places by all persons or groups except those that were found to be subversive elements, and Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982] (Wirta), in which we invalidated a municipal transportation district regulation that permitted commercial advertising but barred political or other noncommercial messages on its buses, demonstrate that the *377 kind of content-based distinctions that are suspect are those that involve government censorship of subject matter or governmental favoritism among different viewpoints.
In Danskin, supra, 28 Cal.2d 536, the court stated: “It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens its doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable. . . . [¶] The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who hold them, but granting it to those whose convictions and affiliations happen to be acceptable and in effect amplifying their privilege by making it a special one. . . . It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of a democratic assembly would be stilled.” (Id., at pp. 547-548.) Likewise, in Wirta, supra, 68 Cal.2d 51, the court repeated with approval the above quoted language from Danskin, and observed that “[t]he prohibition here is painted with a much broader brush than that . . . condemned in Danskin. There all opinions and beliefs which fell within the protection of the First Amendment could be aired in [public] schools, and only their expression by purportedly subversive elements was barred, . . . here the ban is directly related to the content of the ideas sought to be published. . . . The vice is not that the district has preferred one point of view over another, but that it chooses between classes of ideas entitled to constitutional protection, sanctioning the expression of only those selected, and banning all others. Thus the district’s regulation exercises a most pervasive form of censorship.” (Id., at p. 56.)[16]
*378 The decision in Alternatives failed to recognize that such concerns about government censorship are not raised by a regulation that, responding to the problems and hazards created by the request for an immediate contribution or transfer of money, applies to all solicitation of funds, regardless of the subject matter or viewpoint for which funds are solicited.
Alternatives' literal approach to determining content neutrality is suspect in another sense. It has been observed that “the goals of content neutrality and narrow tailoring are inherently in tension.” (Ellickson, Controlling Chronic Misconduct in City Spaces: Of Panhandlers, Skid Rows, and Public-Space Zoning (1996) 105 Yale L.J. 1165, 1232, fn. 370; see also id., at p. 1236.) Plaintiffs’ proposed approach highlights and exacerbates that tension.
As noted above, the regulation of solicitation long has been recognized as being within the government’s police power (Dart, supra, 172 Cal. 47, 56 (conc. opn. of Shaw, J., for maj. of court); Gospel Army, supra, 27 Cal.2d 232, 246; Eye Dog Foundation v. State Board of Guide Dogs for the Blind (1967) 67 Cal.2d 536, 549-550 [63 Cal.Rptr. 21, 432 P.2d 717]; Fogelson, supra, 21 Cal.3d 158, 165-166 (maj. opn.); id., at pp. 168-169 (conc. opn. of Mosk, J.)), and yet plaintiffs’ suggested approach to content neutrality in many instances would frustrate or preclude the kind of narrow tailoring that generally is demanded with regard to the exercise of such police-power regulation in the area of protected expression. If, as plaintiffs suggest, lawmakers cannot distinguish properly between solicitation for immediate exchange of money and all other kinds of speech, then it may be impossible to tailor legislation in this area in a manner that avoids rendering that legislation impermissibly overinclusive. In our view, a court should avoid a constitutional interpretation that so severely would constrain the legitimate exercise of government authority in an area in which such regulation long has been acknowledged as appropriate.
D.
We conclude that in light of the history of solicitation regulations in California and the theoretical foundations of the content-based doctrine, regulations such as the Los Angeles ordinance here at issue, that single out the public solicitation of funds for distinct treatment, should not be viewed as content based or constitutionally suspect for purposes of analysis under article I, section 2(a), of the California Constitution. The parties have not cited, nor have we found, anything in the history of the article (e.g., Browne, supra, Report of the Debates (1850); Willis & Stockton, supra, Debates and Proceedings (1878-1879); Cal. Const. Revision Com., Proposed Revision, *379 supra), or in the cases construing it, that is inconsistent with the foregoing conclusion.
V.
In response to the Ninth Circuit’s certification request, we conclude as follows: Regulations such as the Los Angeles ordinance here at issue, banning all aggressive solicitation for the immediate exchange of funds, and banning all solicitation for immediate donations in certain captive audience areas, should be considered content neutral for purposes of article I, section 2(a).
Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

For the latter proposition, the Ninth Circuit cited Xiloj-Itzep v. City of Agoura Hills (1994) 24 Cal.App.4th 620 [29 Cal.Rptr.2d 879] (Xiloj-Itzep) (finding a solicitation regulation to be content neutral under the First Amendment), and City of Fresno v. Press Communications, Inc. (1994) 31 Cal.App.4th 32 [36 Cal.Rptr.2d 456] (City of Fresno) (finding a regulation of door-to-door distribution of advertisements and nonsubscription newspapers to be content based under the California and federal Constitutions). (Los Angeles Alliance I, supra, 157 F.3d 1162, 1165.) In a footnote, the Ninth Circuit observed that, in addition to the decision below, three federal district court opinions have held—based upon Alternatives, supra, 145 Cal.App.3d 436, and Carreras, supra, 768 F.2d 1039—that regulations of solicitation are content based (and hence subject to strict scrutiny) under the California Constitution (Intern. Soc. for Krishna v. City of L.A. (C.D.Cal. 1997) 966 F.Supp. 956, 969 (ISKCon); Berkeley Community Health Project v. City of Berkeley (N.D.Cal. 1995) 902 F.Supp. 1084, 1090 (Berkeley Community); Church of Soldiers of Cross of Christ v. Riverside (C.D.Cal. 1995) 886 F.Supp. 721, 725 (Church of the Soldiers)), and that one such decision has upheld a regulation prohibiting “abusive solicitation” under the First Amendment (Doucette v. City of Santa Monica (C.D.Cal. 1997) 955 F.Supp. 1192 (Doucette)) with no discussion of the California Constitution. (Los Angeles Alliance I, supra, 157 F.3d at p. 1165, fn. 4.)

We recast the question to avoid prematurely restricting the analysis of the state constitutional claim to the terminology contained in the certification request. Our order requested “[t]he certifying court... to notify this court within 10 days should it have any objection to this court’s restatement of the certified question. Briefing shall be deferred pending further order of this court. . . .”
After receiving written notice from the Ninth Circuit that it had “no objection” to the restatement of the certified question, we ordered briefing on the above stated question. Briefing was conducted consistently with California Rules of Court, rule 29.3 (see former rule 29.5(g)(1), now rule 29.5(h)(1)), as follows: City of Los Angeles et al., defendants and appellants, filed an opening brief on the merits. Subsequently, Los Angeles Alliance for Survival et al., plaintiffs and respondents, filed a brief on the merits, after which defendants filed a reply brief. We thereafter granted the requests of six separate entities to each file an amicus curiae brief, and then allowed the parties to respond to all such briefs in consolidated reply briefs.
After reviewing the briefs and the case law, we have concluded that the state law question before us properly may be analyzed by reference to the “content based” terminology contained in the original question, and hence this opinion answers that specific question.

On the last point, the Ohio Supreme Court noted in Scott v. Bank One Trust Co., N.A. (1991) 62 Ohio St.3d 39 [577 N.E.2d 1077, 1080] that its state’s sovereignty “is unquestionably implicated when federal courts construe state law” because if the federal court errs, “it applies law other than Ohio law, in derogation of the state’s right to prescribe a ‘rule of decision.’ ”

Obtaining federal jurisdiction over the state constitutional claim is a simple matter of joining the state constitutional claim with a claim under the First Amendment.

As the Elliott decision observes, courts regularly render what might be viewed as “advisory” opinions in certain situations; for example, in matters that have become moot while the appeal is pending. (See Elliott, supra, 446 P.2d at p. 355 et seq.; see also, e.g., NBC Subsidiary (KNBC-TV), Inc. v. Superior Court (1999) 20 Cal.4th 1178, 1190, fn. 6 [86 Cal.Rptr.2d 778, 980 P.2d 337]; In re Kieshia E. (1993) 6 Cal.4th 68, 74, fn. 5 [23 Cal.Rptr.2d 775, 859 P.2d 1290], and cases cited; Dix v. Superior Court (1991) 53 Cal.3d 442, 454 [279 Cal.Rptr. 834, 807 P.2d 1063], and cases cited.)

Likewise, it has been observed that such an ordinance implicates the First Amendment. The United States Supreme Court has held that charitable solicitation of funds is “a form of speech protected under the First Amendment” (International Soc. for Krishna Consciousness, Inc. v. Lee (1992) 505 U.S. 672, 677 [112 S.Ct. 2701, 2705, 120 L.Ed.2d 541] (Lee); see also Kokinda, supra, 497 U.S. 720, 725 [110 S.Ct. 3115, 3118-3119]; Riley v. National Federation of Blind (1988) 487 U.S. 781, 788-789 [108 S.Ct. 2667, 2672-2674, 101 L.Ed.2d 669] (Riley); Schaumburg v. Citizens for Better Environ. (1980) 444 U.S. 620, 632 [100 S.Ct 826, 833-834, 63 L.Ed.2d 73] (Schaumburg); Heffron v. Int'l Soc. for Krishna Consc. (1981) 452 U.S. 640, 647 [101 S.Ct. 2559, 2563-2564, 69 L.Ed.2d 298] (Heffron)), and we have held that the First Amendment protects the sale of printed material on public sidewalks. (Welton v. City of Los Angeles (1976) 18 Cal.Sd 497, 504 et seq. [134 Cal.Rptr. 668, 556 P.2d 1119].)

As we observed in Dulaney, supra, 11 Cal.Sd 77, our formulation of the time, place, and manner test was “fashioned from a long line of United States Supreme Court cases” (id., at p. 84), and as noted in Savage, supra, 223 Cal.App.3d 1562, analysis of speech regulation under article I, section 2(a), employs “time, place and manner restrictions . . . measured by federal constitutional standards.” (223 Cal.App.3d at p. 1572.) The high court continues to employ the same formulation set out above in its time, place, and manner inquiry. (See, e.g., Ward v. Rock Against Racism (1989) 491 U.S. 781,791 [109 S.Ct. 2746, 2753-2754,105 L.Ed.2d 661] (Ward).)

As has been observed with respect to the same inquiry under the First Amendment, the content-neutral/content-based “distinction has enjoyed growing prominence as a judicial tool for categorizing government actions regarding expression and for justifying the level of scrutiny applied to those actions.” (Williams, Content Discrimination and the First Amendment (1991) 139 U.Pa. L.Rev. 615, 616 (Williams).)

The California free speech provision was modeled verbatim upon article I, section 8 of the New York Constitution of 1846 (see Fritz, More Than “Shreds and Patches”: California’s First Bill of Rights (1989) 17 Hast. Const. L.Q. 13, 23 & fn. 45), which in turn was derived from article VII, section 8 of the New York Constitution of 1821. At the time of California’s 1849 Constitution, most of the states then in the union had constitutional provisions similar to the New York model. (Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws (1909).) That model, in turn, may have been derived from Blackstone’s formulation of the common law. (See 4 Blackstone, Commentaries 151-152 [“Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity”].)
The California free speech provision subsequently was carried over—again, without substantive debate—into the Constitution of 1879 (see, e.g., 1 & 3, Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879, at pp. 150, 221, 1178 [introduction of proposed provisions and debate thereon] & 1522 [describing “principal changes” made in art. I as adopted] (Willis & Stockton, Debates and Proceedings (1878-1879)), and, with only minor grammatical change, into the constitutional revisions adopted November 5, 1974 (see Cal. Const. Revision Com., Proposed Revision, art. I, § 11, pt. 5 (1971), p. 23 (Proposed Revision) [setting forth proposed art. I, § 11, which became the present art. I, § 2(a)]).

Forty other current state constitutions fall into this category. (See Constitutions of the United States, National and State (2d ed. 1978); see also Ex Parte Tucci (Tex. 1993) 859 S.W.2d 1, 37-58 (cone. opn. of Phillips, C. J.) [appendix quoting all former and then current free speech clauses of all state constitutions].)

 At least one state with a provision similar to ours has found it to be, as a general matter, no broader than the First Amendment. (E.g., Eastwood Mall, Inc. v. Slanco (1994) 68 Ohio St.3d 221 [626 N.E.2d 59, 61].)

In some areas we have found that the protection afforded by the California liberty of speech clause is coterminous with that provided by the federal Constitution. (E.g., Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 745-746 [257 Cal.Rptr. 708, 771 P.2d 406] [applying 1st Amend, standards in defamation action under art. I, § 2].)

In Ward, the court cited in support Renton v. Playtime Theatres, Inc. (1986) 475 U.S. 41 [106 S.Ct. 925, 89 L.Ed.2d 29], which concerned a zoning ordinance restricting the locations of adult theaters. There, in response to Justice Brennan’s assertion that “[t]he ordinance discriminates on its face against certain forms of speech based on content” (id., at p. 57 [106 S.Ct. at p. 934] (dis. opn. of Brennan, J.)), the court conceded that the ordinance “treats theaters that specialize in adult films differently from other kinds of theaters” (id., at p. 47 [106 S.Ct. at p. 929]), but, referring to its “so-called ‘content neutral’ ” rule (id., at p. 47 [106 S.Ct. at p. 928]), found the ordinance was “aimed not at the content of the films shown at ‘adult motion picture theatres,’ but rather at the secondary effects of such theaters on the surrounding community.” (Ibid., italics in original.) The court upheld the ordinance as being “completely consistent with our definition of ‘content-neutral’ speech regulations as those that ‘are justified without reference to the content of the regulated speech.’ ” (Id., at p. 48 [106 S.Ct. at p. 929], italics in original.)

Neither the plurality in Kokinda, supra, 497 U.S. 720, nor Justice Kennedy’s concurring opinion in that case, directly responded to the argument of the dissent. We observe that the position set forth by the dissent in Kokinda seems inconsistent with the high court’s unanimous conclusion in Heffron, supra, 452 U.S. 640.

The only decision concerning a solicitation regulation that appears to hold to the contrary under the First Amendment, Blair v. Shanahan (N.D.Cal. 1991) 775 F.Supp. 1315, was remanded to the trial court (Blair v. Shanahan (9th Cir. 1994) 38 F.3d 1514), after which the original opinion and order was vacated. (Blair v. Shanahan (N.D.Cal. 1996) 919 F.Supp. 1361.)

The court further explained in Wirta: “A minimum of imagination is required to illustrate the paradoxical scope of the district’s policy. A cigarette company is permitted to advertise the desirability of smoking its brand, but a cancer society is not entitled to caution by advertisement that cigarette smoking is injurious to health. A theater may advertise a motion picture that portrays sex and violence, but the Legion for Decency has no right to post a message calling for clean films. A lumber company may advertise its wood products, but a conservation group cannot implore citizens to write to the President or Governor about protecting our natural resources. An oil refinery may advertise its products, but a citizens’ organization cannot demand enforcement of existing air pollution statutes. An insurance company may announce its available policies, but a senior citizens’ club cannot plead for legislation to improve our social security program. The district would accept an advertisement from a television station that is commercially inspired, but would refuse a paid nonsolicitation message from a strictly educational television station. Advertisements for travel, foods, clothing, toiletries, automobiles, legal drugs—all these are acceptable, but the American Legion would not have the right to place a paid advertisement reading, ‘Support Our Boys in Viet Nam. Send Holiday Packages.’ ” (Wirta, supra, 68 Cal.2d 51, 57-58.)